UNITED STATES of America

v.

JANNOTTI, Harry P. Schwartz,
George X.

Appeal of Harry P. JANNOTTI, in
No. 83–1093.

Appeal of George X. SCHWARTZ,
in No. 83–1094.

Nos. 83–1093, 83–1094.

United States Court of Appeals,
Third Circuit.

Argued Sept. 12, 1983.

Decided Feb. 21, 1984.

Rehearing and Rehearing In Banc
Denied March 20, 1984.

216

J. Clayton Undercofler, III (argued), Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for appellant Jannotti.

Edward H. Rubenstone (argued), Richard A. Sprague, Sprague & Rubenstone, Philadelphia, Pa., for appellant Schwartz.

James J. Rohn (argued), Asst. U.S. Atty., Philadelphia, Pa., for appellee.

Before SEITZ, Chief Judge, GIBBONS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge:

Harry P. Jannotti and George X. Schwartz appeal sentences imposed after

their convictions for conspiring to violate the Hobbs Act, 18 U.S.C. § 1951(a) (1976), and, in the case of defendant Schwartz, the Racketeer Influenced and Corrupt Organizations Act ("RICO Act"), 18 U.S.C. § 1962(d) (1976). This court has jurisdiction under 28 U.S.C. § 1291.

## I. *PROCEDURAL HISTORY*

Defendants are former members of the Philadelphia City Council. They were tried together on charges of conspiring to interfere with interstate commerce, in violation of the Hobbs Act, 18 U.S.C. § 1951(a), and conspiring to conduct an enterprise through racketeering activities, in violation of the RICO Act, 18 U.S.C. § 1962(d). The indictment charged that the conspiracies existed for approximately three weeks, from about January 11, 1980, to about February 2, 1980. The jury found that Schwartz was guilty on both counts, and that Jannotti was guilty on the Hobbs Act count and innocent on the RICO count.

The district court, however, granted defendants' motions to set aside the guilty verdicts in their entirety, dismissed the Hobbs Act counts for lack of jurisdiction, and entered judgments of acquittal. 501 F.Supp. 1182. The government appealed these orders and judgments, and this court, sitting in banc, reversed and ordered reinstatement of the jury's verdicts. 673 F.2d 578 (3rd Cir.) *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). The district court reinstated the verdicts and imposed sentences.

## II. *FACTUAL BACKGROUND*

A brief statement of the facts of this case will assist in understanding the issues presented in this appeal. A more complete statement of the facts is found in this court's in banc decision. *See* 673 F.2d 578, *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). Schwartz's and Jannotti's indictments resulted from the

FBI's so-called "ABSCAM" investigation of political corruption. The central device in this "sting" investigation was the creation of an elaborate scheme in which FBI undercover agents pretended to represent the interests of a fictitious Arab sheik seeking to immigrate to this country and to construct a large hotel in Philadelphia.

Undercover FBI agents, posing as representatives of the sheik, came to Philadelphia in January 1980 to seek out city officials who would promise political favors in exchange for cash. Specifically, the agents sought help from some members of the Philadelphia City Council on such matters as zoning and building permits. The agents had previously met with Howard Criden, a Philadelphia lawyer, and through Criden they met in January with Schwartz, Jannotti, and Louis Johanson, all members of the City Council.[1] At these meetings the defendants and Johanson accepted cash payments and made promises of political assistance to the sheik on matters before the city council. All of these meetings took place at the Barclay Hotel in Philadelphia, where the agents had set up audio and video tape equipment to record the conversations surreptitiously. Telephone conversations were also recorded. These audio and video tapes played a crucial role in the prosecutions of Schwartz and Jannotti.

## III. *JURISDICTION UNDER THE HOBBS ACT*

Defendants raise numerous objections to their convictions. They first argue that this court, in its earlier decision in banc, announced the standard for jurisdiction under the Hobbs Act but ignored a secondary contention, that the evidence failed to meet that standard. Defendants therefore renew in this appeal their argument that the evidence was insufficient. We disagree that the issue of the sufficiency of the evidence was not considered in the earlier

---

1. Criden and Johanson were convicted in the Eastern District of New York on charges of conspiracy and bribery. Their convictions were upheld on appeal. *United States v. Myers,* 692 F.2d 823 (2d Cir.1982), *cert. denied,* — U.S. ——, 103 S.Ct. 2437, 2438, 77 L.Ed.2d 1322 (1983).

opinion. After a thorough examination of the record, this court held as follows:

> In this case the jury found that the defendants conspired to violate the Hobbs Act by their acceptance of payments in return for their promises to expedite completion of an elaborate hotel project which, had it been constructed, would have entailed at least a $30 million expenditure. Had the project actually been planned as represented, defendants' actions would have violated the Hobbs Act even if unforeseen difficulties, such as the overthrow of the "sheik", prevented any further action on the project. The federal interest in protecting interstate commerce is no less under the factual situation presented in this case. The threat posed by defendants' actions is just as great. Since Congress has exercised the full scope of its commerce power in the Hobbs Act, we conclude that there was Hobbs Act jurisdiction.

673 F.2d at 594. It is clear from this passage that the court in its earlier opinion not only articulated a standard for jurisdiction under the Hobbs Act but also held that jurisdiction existed on the basis of evidence presented by the government.

## IV. *HEARSAY EVIDENCE*

Both defendants argue that the district court improperly admitted various pieces of important hearsay evidence. Unless otherwise noted, defendants entered timely objections to the admission of this evidence at trial.

■ All of the evidence at issue was admitted under the "coconspirator exception" to the rule against hearsay, Fed.R. Evid. 801(d)(2)(E). Under that exception, the out-of-court statements of the defendants' coconspirators will not be excluded as hearsay. The rule is a source of considerable confusion, but its requirements, as construed in this circuit, may be summarized as follows. There must be "independent evidence" of the conspiracy, *i.e.*, evidence independent of the proffered hearsay itself. This evidence must establish by a "clear preponderance" that the conspiracy existed and that both the defendants and the declarant were members of the conspiracy. The "preponderance" test "simply requires the prosecution to present sufficient proof leading the trial judge to find 'that the existence of the contested fact is more probable than its nonexistence.'" *United States v. Ammar*, 714 F.2d 238, 250 (3d Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). Finally, the out-of-court statement must have been made during the course of, and in furtherance of, the conspiracy. *Id.* at 245. Where the district court has admitted such statements under Rule 801(d)(2)(E), our review is limited to the question whether, viewing the evidence in a light most favorable to the proponent (in this case the government), the district court had "reasonable grounds" to support its ruling. *Id.* at 249.

### A. *Proof of the Schwartz-Jannotti Conspiracy*

■ In order to assess the defendants' objections to the admission of certain out-of-court statements, it is necessary to review first their challenge to the district court's finding that there was a preponderance of independent evidence establishing a conspiracy to which the defendants belonged. If we conclude that the district court had reasonable grounds for its finding, we must then inquire whether the out-of-court statements challenged by the defendants satisfied the other requirements of Rule 801(d)(2)(E).

We have no doubt whatsoever that the district court had reasonable grounds for finding that a preponderance of the independent evidence established a conspiracy in which Schwartz, Jannotti, and Criden were members. The goal of this conspiracy was illegally to assist the fictitious sheik in matters before the Philadelphia City Council relating to the hotel project, in exchange for cash. In the videotape of a meeting between Schwartz, Criden, and the undercover agents on January 23, 1980, Schwartz told the agents that "we got uh five or six now [new?] members [of the City Council] that came in. Uh, you tell me

your birth date. I'll give them to you for your birthday. (Laughter)." (App. 696a) This statement was independently admissible as an admission under Rule 801(d)(2)(A). Schwartz also made statements that evidenced Criden's complicity in the conspiracy. For example, Schwartz told the agents that "[t]here are certain protocol that should be worked out in advance and that's where the law firm, Howard [Criden], will become involved. To put it together so that it doesn't boomerang." (App. 756a) At the conclusion of the meeting, Schwartz examined and accepted an envelope containing $30,000 in cash.

In the videotape of the meeting between Criden, Jannotti and the agents, also admissible under Rule 801(d)(2)(A), Jannotti stated the following:

JANNOTTI: We'll go in there [the City Council] and battle, we'll go in and battle.

AGENT: You're with us?

JANNOTTI: Certainly, we'll go in and battle.

(App. 867a) Jannotti also explained to the agents that Schwartz had told him about the proposed scheme:

AGENT: Okay, ah, are you aware of my position and ah, ah.

JANNOTTI: George [Schwartz] has told me.

(App. 848a) At the conclusion of this meeting, the agents gave Jannotti an envelope containing $10,000 in cash.

Because we are convinced that the district court had reasonable grounds for finding that a conspiracy was established by a preponderance of the evidence, we must now consider the defendants' challenges to the admission of particular out-of-court statements under the coconspirator rule.

### B. *The Telephone Calls*

 The defendants first challenge the admission of audio tapes of three phone conversations on January 11 and January 18, 1980, between Howard Criden and an undercover FBI informant. Defendants ar-

gue that the conspiracy discussed above had not yet begun at the time of these conversations, and that the tapes therefore should not have been admitted under Rule 801(d)(2)(E). The indictment charged both defendants with belonging to a conspiracy starting January 11, the date of the earliest of the conversations at issue. The government, however, does not challenge in its brief the defendants' assertion that no conspiracy existed at the time of these conversations. Instead, the government seems to argue that the tapes were admissible because they were merely "background" and nonprejudicial. The government, however, has cited no authority for a "background" exception to the hearsay rule, and we will therefore assume that these tapes should have been excluded from evidence at trial.

We reject defendants' contention, however, that admission of the evidence constitutes reversible error. Neither Schwartz nor Jannotti is mentioned in the conversations. The January 18 conversations simply concern the arrangements for the meeting between Criden and the undercover agents and do not hint at illegality. We agree that certain remarks during the January 11 conversation suggest a general atmosphere of corruption. Criden refers to a law partner who is a city councilman, suggesting a deal in the making that might involve political favors. This reference, however, is harmless in view of admissible evidence, considered later, that the partner, Johanson, was indeed a member of the defendants' conspiracy. There are also remarks in the conversation about arrangements being made with Philadelphia-area congressmen who were later indicted and convicted for involvement in ABSCAM. The possibility that the defendants were prejudiced by this indirect association with the congressmen is insignificant in view of other proof of the defendants' guilt, including the statements of Schwartz and Jannotti quoted above. We therefore conclude that it is "highly probable" that these tapes "did not contribute to the jury's judgment of conviction." *Government of Virgin Is-*

*lands v. Toto,* 529 F.2d 278, 284 (3d Cir. 1976).[2]

■ Defendants also challenge the admission of these particular tapes on the ground that the admission violated their rights under the sixth amendment to confront witnesses. This issue is raised for the first time on appeal, no objection having been entered in the district court. We will assume without deciding that questions of alleged constitutional error under the sixth amendment are generally cognizable under the doctrine of "plain error", Fed.R.Crim.P. 52(b), and that the admission of this hearsay evidence failed to satisfy the requirements of the confrontation clause. We conclude, however, that the admission of these tapes, if erroneous, was harmless beyond a reasonable doubt. *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

C. *The Meetings on January 18, 1980*

■ The defendants next challenge the admissibility of videotapes of meetings between Criden and the FBI undercover agents, and between Criden, the agents, and Louis Johanson, a partner in Criden's law firm and a member of the Philadelphia City Council. Defendants challenge this evidence on various grounds. The first meeting, they assert, took place before the conspiracy began. As explained above, we are willing to assume that this is true and that the evidence should have been excluded at trial. We believe, however, that this evidence was merely cumulative. At the meeting, the agents explained the fictitious hotel project in greater detail to Criden. The agents told Criden they needed help with the many problems that would arise during such a project, and the discussion

turned to Johanson and Schwartz. Criden agreed to help enlist them, and the agents promised him $10,000 in return. In view of the very persuasive and damning evidence noted elsewhere in this opinion, it is highly probable that the supposedly erroneous admission of this evidence did not influence the jury in any substantial way, despite the fact that defendant Schwartz was mentioned by name on the tape as a potential coconspirator.

Defendants challenge the admission of the tape of the second meeting, between the agents, Criden, and Johanson, on the grounds that there was no independent evidence establishing that Johanson had joined the conspiracy between Schwartz, Jannotti, and Criden. In addition, they argue that even if there were such independent evidence, the tape of the January 18 meeting was inadmissible because the meeting occurred before Schwartz and Jannotti joined the conspiracy, and because, by the time they did join, Johanson had withdrawn. The defendants challenge the admission of the tape of the third meeting, after Johanson had left, on the ground that Criden's remarks to the undercover agents were not in furtherance of any conspiracy, even the one between Criden and Johanson.

■ We first consider whether Johanson was a member of the Schwartz-Jannotti conspiracy described above. The independent evidence of Johanson's involvement is not as strong as the evidence against Schwartz, Jannotti, and Criden, but we nonetheless conclude, without hesitation, that the district court had reasonable grounds for holding that the evidence satisfied the preponderance requirement.

There was independent evidence that undercover FBI agents established a scheme to solicit political help from Philadelphia

---

**2.** The "high probability" standard is different from the "reasonable doubt" or "reasonable possibility" standard of appellate review used to determine the harmlessness of constitutional error. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). "High probability" requires that we have a sure conviction that the error did not prejudice the defendants. *Cf. Kotteakos v. United States,* 328 U.S.

750, 764–65, 776, 66 S.Ct. 1239, 1247–48, 1253, 90 L.Ed. 1557 (1946). We may not simply conclude that it is more likely than not that the error was harmless. On the other hand, we may be firmly convinced that the error was harmless without disproving every "reasonable possibility" of prejudice. *See* R. Traynor, *The Riddle of Harmless Error* 33–37, 44–45 (1970).

City Council members on matters affecting a hotel project (App. 552a), and that Schwartz and Jannotti agreed to sell political favors to these agents. There was also independent evidence that Johanson was a council member serving on the council committee dealing with zoning matters (App. 177a), that Johanson met with these same agents and Criden less than a week before the agents' meetings with Schwartz and Jannotti, described above, and that Johanson accepted $25,000 in cash from them (App. 471a). Finally, independent evidence established that Criden was paid $5,000 for "producing" Johanson (App. 524a, 572a, 577a), and that Criden was depositing the money he was receiving from the agents in a safe deposit box which was accessible only to Criden, Johanson, and another member of their law firm (App. 596a–97a). We have no doubt that the district court had reasonable grounds for including Johanson in the conspiracy on the basis of this evidence.

■ The question remains whether Johanson's particular statements at the meeting on January 18 were admissible. Defendants argue that even if Johanson were a member of the conspiracy, this particular meeting took place before Schwartz and Jannotti joined. Moreover, Johanson had withdrawn from the conspiracy by the time they became members. The fact that the Johanson meeting occurred before Schwartz and Jannotti joined the conspiracy is without legal significance. The Supreme Court has held that "the declarations and acts of the various members, even though made or done prior to the adherence of some to the conspiracy, become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy." *United States v. United States Gypsum Co.*, 333 U.S. 364, 393, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). *See also United States v. Lester*, 282 F.2d 750, 753 (3d Cir.1960); *Lefco v. United States*, 74 F.2d 66, 68 (3d Cir.1934).

■ We find the defendants' withdrawal argument unsupported by the evidence. The record indicates that Johanson refused to help Criden enlist Schwartz (App. 607a), and it also suggests that Johanson was unaware that Criden was able to contact Schwartz despite this refusal. There is no evidence at all, however, that Johanson had withdrawn from the conspiracy. Indeed, he had accepted $25,000 from the undercover agents only a few days before his decision not to enlist Schwartz, and there is no reason to believe he did not still intend to provide political favors as promised. As this court has explained, "[t]he defendant must present evidence of some affirmative act of withdrawal on his part, typically either a full confession to the authorities or communication to his co-conspirators that he has abandoned the enterprise and its goals." *United States v. Steele*, 685 F.2d 793, 803 (3d Cir.), *cert. denied*, 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982). Once the defendant has made a prima facie showing of withdrawal, the burden shifts to the government either to impeach the defendant's proof or to show some act by the defendant in furtherance of the conspiracy and subsequent to the alleged withdrawal. *Id.* The defendants have not made a prima facie showing of withdrawal. The mere possibility that Johanson may not have known that Criden enlisted Schwartz on his own does not require us to conclude that Johanson had withdrawn or had somehow become a member of a different conspiracy, since "[i]t is well-established that one conspirator need not ... be aware of all the details of the conspiracy in order to be found to have agreed to participate in it." *United States v. Riccobene*, 709 F.2d 214, 225 (3d Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983).

■ We also reject defendants' assertion that Criden's statements to the agents at the meeting immediately after Johanson's departure were not in furtherance of the conspiracy. At that meeting, Criden met alone with the undercover agents, discussed the enlistment of Schwartz and Jannotti, and received $5,000 for enlisting Johanson. (App. 499a–500a) It is difficult to

222

imagine statements more in furtherance of a conspiracy to sell political favors.

### D. *The Criden Meetings on January 23 and 24, 1980*

█ Finally, the defendants challenge the admission of videotapes of two meetings between Criden and the undercover agents. The first of these meetings occurred on January 23, 1980, immediately after the meeting between Criden, the agents, and Schwartz. The second occurred on January 24, 1980, immediately after the meeting between Criden, the agents, and Jannotti.

The defendants challenge the admission of these videotapes on the ground that the statements at the meetings were not in furtherance of the conspiracy to buy influence among members of the city council. The improper admission of these videotapes, they argue, was prejudicial and constitutes reversible error.

We find that, with the exceptions discussed below, the statements at the two meetings between Criden and the undercover agents were in furtherance of the conspiracy to buy influence. At the first meeting, Criden collected $5,000 for introducing Schwartz to the agents. Criden assured the agents that Schwartz was corrupt and would fulfill his end of the illegal bargain. (App. 760a) The conversation then turned to the proposed meeting with Jannotti. The agents asked Criden whether the meeting had been arranged, and Criden responded that he had had some difficulties (App. 762a–64a) and was not sure Jannotti could or should be included (App. 771a). Eventually Criden agreed to try to arrange the meeting, and there was a discussion of the price required to purchase Jannotti's assistance. Criden and the agents decided to begin with an offer of $10,000.

At the second meeting, the agents asked Criden whether Jannotti understood the arrangement and could be relied on to perform. Criden responded that Jannotti understood the offer and was reliable. (App. 895a, 897a, 905a)

In each of these two meetings, the agents and Criden discussed the probable success of the scheme and the amounts required to buy the influence of the coconspirators. Although not as central to the conspiracy as the agents' meetings with Jannotti, Schwartz, and Johanson, these meetings nonetheless clearly and materially advanced the conspiracy toward its goal of using illegally acquired political influence to eliminate obstacles to the construction of the hotel. We therefore hold that these portions of the videotapes were properly admitted under Rule 801(d)(2)(E).

█ We agree with defendants, however, that certain portions of these videotapes in which the parties discussed certain United States Congressmen were inadmissible because the discussions were not in furtherance of the conspiracies charged. Defendants challenge the admission of tapes of both the January 23 and the January 24 meetings on this ground. The government responds that the defendants at trial withdrew their objection to the January 23 meeting. (App. 195a–96a, 792a–94a, 798a) Although the trial transcript is not very clear, we believe that the withdrawn objection was a relevancy objection entered after the jury had viewed the videotape, not the Rule 801(d)(2)(E) objection entered prior to the viewing. (App. 684a) We will therefore review both the January 23 and the January 24 meetings.

In the meeting on the 23rd, the agents and Criden discussed two Pennsylvania congressmen and referred to deals with them that were apparently different from the hotel project. (App. 766a–67a, 774–77a, 781a–82a) In the meeting on the 24th, the agents and Criden discussed an upcoming meeting with a member of Congress from the Philadelphia area. Later during the meeting, the congressman called and talked to one of the agents. (App. 894a, 906a–07a)

The presence of these discussions on the tapes is not surprising, of course, since ABSCAM was a large and diverse undertaking, with many overlapping instances of

graft and corruption. The government, however, has not argued before this court that these other schemes were part of the conspiracy with which we are concerned, and apparently the government made no such argument at trial. This court is aware that in some instances it may be very difficult to delete inadmissible portions of a videotape without rendering the evidence unintelligible. Such is not the case here, however. We have no doubt that the objectionable portions of these videotapes could have been deleted without seriously affecting the impact of the tapes as a whole, and we therefore conclude that these portions of the tapes should not have been admitted.

Despite this conclusion, however, we find such error was not prejudicial to the defendants in any significant way. Any blemishes to the defendants' characters resulting from the admission of this evidence were utterly insignificant in view of the admissible evidence against the defendants.

### E. *Conclusion*

We conclude that, with the exception of the statement made about the congressman, discussed above, and the earlier tapes of Criden's meetings with the agents, which we assume to be inadmissible but harmless, all of the hearsay evidence offered by the government under Rule 801(d)(2)(E) was properly admitted.

### V. *THE ENTRAPMENT CHARGE*

Defendants next argue that the district court improperly charged the jury on the issue of entrapment by bifurcating the burden of proof and requiring the defendants to satisfy a threshold burden before they could be entitled to jury consideration of the defense. Our review of this issue is plenary.

The district court's charge to the jury on the issue of entrapment was a long one, and what follows are only the passages most relevant to the defendants' argument.

Before an issue of entrapment arises and before you have to consider entrapment the evidence must lead you to believe that the Government induced the defendant to commit the crime charged.... The issue really is: Is this a crime which would have been committed without the Government's participation or is this something where the idea for committing this particular crime originated with the Government and that it was the Government's idea that this particular crime be committed? (App. 1351a)

If the government is responsible for inducement—that is, if the idea for committing the crime originated with the Government, if this specific crime would not have been committed but for the Government's idea and action—then in order to obtain a conviction the Government must go further and must prove beyond a reasonable doubt that the defendant was predisposed to commit crimes of that type. (App. 1352a)

If there was inducement, then the Government cannot obtain a verdict of guilty unless the evidence as a whole proves beyond a reasonable doubt that the particular defendant was predisposed to commit that type of offense. (App. 1362a)

[Y]ou are, first of all, on the one hand, not here to decide generally whether you like what the Government did or not but, rather, the specific question as to whether what they did amounted to inducement and, if so, whether they have shown predisposition. (App. 1366a)

After the charge had been given, a side-bar conference was held to consider objections. Defendants' lawyers argued that the court had instructed the jury on a bifurcated burden of proof on the issue of entrapment, which was improper in view of certain prior decisions in this circuit. The court apparently rejected this argument but agreed for other reasons to supplement the charge on entrapment. In this supplemental charge, the court stated the following:

If you find from the evidence that there was inducement, that the crime was induced by the Government agents—that is, if you accept as correct the inferences urged upon you by de-

fense counsel to the effect that Criden was being paid money to bring them in and that they were being offered this hotel project only on condition that they accept and so forth, if there was inducement—if you find those facts to be correct, then that would amount to inducement and you would therefore acquit the defendants unless the evidence as a whole satisfies you beyond a reasonable doubt that they were predisposed.

In short, the burden is upon the Government in a case of this kind to prove beyond a reasonable doubt that there was no entrapment. If the defendants were induced to commit the crime, then they were entrapped and should be acquitted unless the Government satisfies you beyond a reasonable doubt that they were predisposed to commit the crime. (App. 1378a–79a)

■■■ To analyze the defendants' objection to this charge, we turn to an earlier decision of this court, *United States v. Watson*, 489 F.2d 504 (3d Cir.1973), where we considered how to charge a jury on entrapment. To be entitled to such a charge, the defendant must first show "(1) evidence that the Government initiated the crime, regardless of the amount of pressure applied to the defendant, and (2) any evidence negating the defendant's propensity to commit the crime." *Id.* at 509. The question of whether the defendant is entitled to the entrapment charge is for the court. *Id.* at 511. *See also United States v. Wolffs*, 594 F.2d 77, 81 (5th Cir.1979). If the court decides to give the charge, it must follow the "unitary" approach, in which the burden to disprove the entrapment defense as a whole, beyond a reasonable doubt, is placed exclusively on the government. Failure to place this burden exclusively on the government will not be cured by the presence of a general charge that the government has the burden of proving the defendant's guilt beyond a reasonable doubt. *Watson*, 489 F.2d at 51 n. 10; *Government of Virgin Islands v. Cruz*, 478 F.2d 712, 717 (3d Cir.1973) (dictum).

■■■ The focus of the entrapment defense is on the defendant's predisposition, as required by the Supreme Court in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). Inducement, however, is not irrelevant. As this court explained in *Watson*,

the stronger the inducement, the more likely that any resulting criminal conduct of the defendant was due to the inducement rather than to the defendant's own predisposition. Under the unitary approach we require, inducement therefore enters as an element of predisposition which the Government must disprove, rather than as an independent element which the defendant must prove.

489 F.2d at 511.

This approach is to be distinguished from the "bifurcated" approach, in which the burden of proof is divided between the defendant and the government. Under the bifurcated approach, the jury must first consider whether the defendant has met his burden on the issue of inducement. If so, then the jury must consider whether the government has proved predisposition. *See United States v. Sherman*, 200 F.2d 880, 882–83 (2d Cir.1952). This court rejected the bifurcated approach in *Watson*, 489 F.2d at 510, 511.

Our preference for the unitary approach is grounded in several concerns. First, the Supreme Court has clearly held that entrapment is, at bottom, a question of the defendant's predisposition and not the government's inducement, although the latter is a relevant consideration. *Russell, supra*, 411 U.S. at 433–36, 93 S.Ct. at 1643–45. To divide the burden of proof between the defendant and prosecution on the issues of inducement and predisposition encourages the jury to ignore the Supreme Court's holding. Second, the unitary approach avoids the possibility of jury confusion inherent in a shifting burden of proof. Finally, the unitary approach is more consistent with the government's ultimate burden of proving the defendant's guilt beyond a reasonable doubt. Under our approach, the defendant need not offer evi-

dence sufficient to support a *finding* of inducement, as the bifurcated approach would seem to require. Instead, the defendant need only raise a reasonable *doubt* about predisposition. *Notaro v. United States*, 363 F.2d 169, 176 (9th Cir.1966).

Turning to the district court's charge in the present case, we note that the court clearly stated that "the burden is upon the Government in a case of this kind to prove beyond a reasonable doubt that there was no entrapment." (App. 1379a) Repeatedly, however, the court indicated that the defendants had a threshold burden of showing inducement. Not only did this incorrectly divide the burden between the defendants and the government, but it also required an independent consideration of the issue of inducement, apart from the central issue of predisposition. We must therefore conclude that the district court's instruction on entrapment was erroneous.

We are not confronted here with an error affecting the defendants' constitutional rights. The entrapment defense "is not of a constitutional dimension," *United States v. Russell*, 411 U.S. 423, 433, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973), and the erroneous instruction affected no other possible constitutional right. We are therefore not required in this appeal to find beyond a reasonable doubt that the error was harmless, *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Instead, we must use the "highly probable" standard of appellate review discussed above. *Government of Virgin Islands v. Toto*, 529 F.2d 278, 284 (3d Cir. 1976). Applying this standard to the circumstances of this case, we hold that the erroneous instruction is not reversible. Fed.R.Crim.P. 52(a). As noted above, the district court charged the jury that it was obligated to acquit the defendants if the government failed to disprove entrapment beyond a reasonable doubt. This part of the charge was correct. The charge was erroneous insofar as the district court improperly required the defendants to show some evidence of inducement, either by introducing their own proof or by reference

to the government's evidence. This evidence, however, was patent: the government had created an elaborate fiction to convince the defendants that an Arab sheik was prepared to pay bribes to local officials in exchange for favors.

The district court correctly placed on the government the burden of proving predisposition beyond a reasonable doubt. We find that the government's evidence established overwhelmingly that the defendants enthusiastically accepted bribes. There simply is no credible evidence that the defendants were reluctant to take the money. To the contrary, the evidence shows the defendants, each of them an elected public official, boasting of their power and their corruption. In view of this overwhelming proof, we conclude without hesitation that the defendants were not prejudiced by the district court's error.

Defendants also argue that the district court's instruction on entrapment was so confusing as to warrant reversal. We agree that the charge was interspersed with digressions on legal and factual issues unrelated to the question of entrapment. We conclude, however, that the district court's instruction was not prejudicially confusing.

## VI. *ENTRAPMENT AND AGENCY*

Related to the defendants' challenge to the entrapment instructions is the argument that they were entitled, as a matter of law, to an instruction that Criden should be considered a government agent in determining whether there was entrapment. This argument, even if meritorious, is unavailing, since there is no evidence that Criden attempted to induce the defendants beyond informing them of the availability of the sheik's offer. The defendants did not call Criden as a witness, nor did they seek to establish in any other way that Criden was instrumental in persuading the defendants to accept the bribes. We will not guess about such matters. Moreover, we note that the district court instructed the jury on the defendants' claim

that Criden was an agent, and we can only assume that the jury gave the theory whatever weight it was due. We will give it no more.

## VII. *THE RICO CHARGE*

Finally, defendant Schwartz attacks his conviction under the RICO Act. Schwartz was convicted under RICO section 1962(d), 18 U.S.C. § 1962(d), for conspiring to violate section 1962(c). Section 1962(c) states that no person "associated with" an enterprise affecting interstate commerce may "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ...." The "enterprise" in the present case was the law firm of Criden, Johanson, Dolan, Morissey & Cook, in which both Criden and Johanson were partners. Schwartz raises two issues: first, that his conviction was not supported by evidence of a conspiracy to conduct an enterprise through a pattern of racketeering, and second, assuming such a conspiracy did exist, that there was insufficient evidence of Schwartz's membership in it. We will consider these two contentions together. We examine the evidence in a light most favorable to the government to determine whether a jury could have resolved these issues against Schwartz beyond a reasonable doubt.

We begin by noting the obvious. There is no question that a conspiracy existed to sell political favors to a fictitious Arab sheik, and that Schwartz was a member of that conspiracy. The evidence discussed above amply supports these conclusions. The question now under consideration is whether there was a *RICO* conspiracy, and whether Schwartz knowingly joined that RICO conspiracy.

The Fifth Circuit has stated, and we agree, that "[t]he mere fact that a defendant works for a legitimate enterprise and commits racketeering acts while on the business premises does not establish that the affairs of the enterprise have been conducted 'through' a pattern of racketeering activity." *United States v. Cauble*, 706 F.2d 1322, 1332 (5th Cir.1983). Instead, the government must show that a person "is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise; or ... the predicate offenses are related to the activities of that enterprise.'" *United States v. Provenzano*, 688 F.2d 194, 200 (3d Cir.), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982) (quoting *United States v. Scotto*, 641 F.2d 47, 54 (2d Cir.1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981)). In order to establish a conspiracy to violate section 1962(c), "the government must prove beyond a reasonable doubt that ... the individuals knowingly agreed to participate in the 'enterprise' through a pattern of racketeering." *United States v. Riccobene*, 709 F.2d 214, 220–21 (3d Cir.), *cert. denied*, ——— U.S. ———, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983).

With these principles in mind, we turn to the record. Evidence presented to the jury would have allowed it to conclude beyond a reasonable doubt (1) that the AB-SCAM "front" involved a fictitious Arab sheik who wished to contact a politically influential Philadelphia law firm as part of an effort to build the hotel; (2) that Schwartz knew this; and (3) that Schwartz agreed not only to perform political favors but also to set up contacts with the Philadelphia firm of Blank, Rome, Comisky & McCauley.[3] The jury could also reasonably have concluded that Criden regarded the

---

**3.** At the meeting on January 23, 1980, between Schwartz, Criden, and the undercover agents, one of the agents asked if Schwartz knew of a "local, politically savvy" law firm that the sheik could use. (App. 725a) Criden responded that Schwartz's old law firm, Blank, Rome, was the best candidate because of its expertise in building and zoning matters. (App. 726a–27a) Cri-

den explained that he and Schwartz had "already discussed" the matter of the law firm. (726a–27a, 752a) Finally, Schwartz explained that Criden would work with the firm to take care of "certain protocol that should be worked out in advance ...." (App. 755a–56a) This was to insure that the deal did not "boomerang." (App. 756a)

illegal deal he had struck with the sheik as a business matter for his own firm of Criden, Johanson, Dolan, Morissey & Cook, and that Criden regarded the sheik and the undercover agents as the firm's "clients".[4] Finally, the evidence would have allowed the jury reasonably to conclude that although the Blank, Rome firm was expected to get most of the sheik's business, Criden expected his firm to continue to benefit, and that Schwartz knew this.[5]

In view of this evidence, we conclude that a jury could have decided, beyond a reasonable doubt, that legal work was an important part of the proposed transaction, that Criden's firm was expecting to do some of this legal work, and that Schwartz knew this. The jury could therefore have concluded beyond a reasonable doubt that Criden and Schwartz knowingly agreed to conduct or participate, directly or indirectly, in the conduct of the law firm's affairs through a pattern of racketeering activity, as proscribed by the RICO Act.

## VIII. CONCLUSION

For the above stated reasons, the sentences of defendant Schwartz under the Hobbs Act and the RICO Act, and the conviction of defendant Jannotti under the Hobbs Act, will be affirmed.[6]

ROSENN, Circuit Judge, concurring and dissenting.

I concur in and join the majority opinion except insofar as it sustains the RICO conviction. I respectfully dissent from part VII (the RICO charge) and part VIII because the Government has not proved that

---

**4.** At the same meeting described in the preceding footnote, Schwartz told the agent that Criden could "help" in the search for a firm. The agent responded that it might be difficult to use Criden's firm because one of the partners (Johanson) was a member of the City Council, and it might create the appearance of a conflict of interest. The agent emphasized, however, that he did not want to cut Criden out of the action. Criden reassured the agent that he and Schwartz had discussed these matters, and that there was no reason to worry. (App. 725a–26a)

Ellis Cook, one of Criden's law partners, testified at the trial that on January 21, 1980, Criden gave him two sums of money, $3,000 and $5,000, both in cash. Criden described the first payment to Cook as his "fee" for the meeting between Criden, Johanson, and the undercover agents three days earlier. Criden told Cook that the second amount was part of Johanson's payment, and that Cook was to put it in a safe deposit box accessible only to Criden, Johanson, and Cook. (App. 596a–97a) Cook had leased the safety deposit box, on Criden's instructions, long before this meeting. As Cook explained, "it was to hold certain valuable papers for clients." (App. 620a) At Criden's request, Cook later withdrew this money in the form of bank money orders. The money orders were payable to the Criden, Johanson law firm. (App. 598a–600a) When asked why Criden was giving money to him, Cook explained that Criden "had always been good to me, plus I had to do the legal work that was coming out of this." (App. 624a. *See also* App. 626a–27a, 640a, 643a.)

**5.** Ellis Cook testified that Criden told him the hotel project would be handled by the Blank, Rome law firm, but that "[t]hey would be work-ing with us on the project." (App. 606a–07a) Criden indicated that he might be talking to someone about the possibility that Cook, Criden, and another partner would join the Blank, Rome firm. (App. 607a) This would bring to four the number of partners at the firm who had profited or could expect to profit from the hotel project and the legal business it would generate. Three of these were "name" partners. At the meeting on January 23, 1980, between Criden and the undercover agents after Schwartz had left the room, Criden explained the legal arrangements. He stated that there would be "substantial legal fees involved" and that these fees would be shared:

> For obvious reasons, okay, there will be substantial legal fees involved. Now I made a deal with him today. Okay, which was one of the reasons that everything worked so smooth because what was given to him was minor in comparison to what will be made in legitimate legal fees in a project of this nature. (App. 759a)

**6.** Defendants also raised certain issues in order to preserve them for future appeal. These issues, according to the defendants' briefs, are the following: the nature of the proof necessary to show the requisite jurisdictional effect on interstate commerce under the Hobbs Act; the sufficiency of the government's proof of extortion under the Hobbs Act; whether the defendants were entrapped as a matter of law; and whether the government violated the defendants' due process rights during the course of its ABSCAM investigation. These issues were decided by this court in its previous in banc decision, 673 F.2d 578, *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982).

Schwartz committed the offense charged in the RICO indictment.

## I.

As the majority opinion notes, both appellants, members of the Philadelphia City Council, were convicted of having conspired to obstruct interstate commerce in violation of the Hobbs Act by accepting payments in return for promises to expedite the construction of a major hotel complex in the city. The construction plan, however, was only part of a "sting" operation. On the same operative facts, the jury also found the defendant Schwartz guilty of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d) (1976).

The RICO indictment (count II) charged Schwartz and Jannotti, together with Criden, Johanson, and an unindicted coconspirator, Ellis Cook, with conspiracy to conduct and participate in the conduct of the affairs of a law firm, Criden, Johanson, Dolan, Morrissey & Cook (the firm), through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d) (1976). The first paragraph of the indictment defined the firm as a business and legal entity engaged in the practice of law in Philadelphia, Pennsylvania, and as constituting an "enterprise engaged in, and the activities of which affected, interstate commerce." Criden and Johanson were partners in that firm; Schwartz and Jannotti were not.

The object of a RICO conspiracy is to violate a substantive provision of the RICO statute. The substantive provision of RICO that the indictment charged Schwartz with having conspired to violate is section 1962(c). It provides in pertinent part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

## II.

Criden implicated Schwartz in this fictitious project before Schwartz had any knowledge of it or its principals. On Friday, January 18, 1980, Criden met with undercover agents Wald and Haridopolos at Philadelphia's Barclay Hotel. Wald told Criden that an Arab sheik was interested in constructing a large hotel complex in Philadelphia and desired advance assurances that there would be no zoning or labor problems. Criden hastily assured the agents there would be no such problems and suggested the possibility of dealing with Johanson, a member of the City Council, and Schwartz, its president. They discussed "the tariff" for each of the men and agreed to arrange a meeting with Councilman Johanson. The agents promised Criden a fee of $10,000 for introductions to Johanson and Schwartz.

With visions of the $10,000 in hand, Criden lost no time in returning that same evening with Johanson. Johanson gave the agents the assurances they sought. The agents, in turn, presented him with $25,000. Wald then asked Johanson whether Schwartz could help the sheik and Johanson replied that Schwartz and Councilman Jannotti controlled the City Council. Johanson indicated that he would explore the possibility of arranging a meeting with Schwartz and Jannotti. He then departed. Criden remained and discussed with the agents how they might enlist the services of Schwartz and Jannotti and how much they might have to spend. At the end of the meeting, Wald gave Criden $5,000 for his personal services and promised him "five [more] for the next delivery."

Johanson never introduced Schwartz or Jannotti to the agents. Over the weekend he had second thoughts about his conversation with the agents and Criden. When Criden called Monday morning to arrange for a meeting with Schwartz, Johanson refused to make the introduction or to set up a meeting with Jannotti. There is no indication that Johanson had any subsequent involvement in the matter.

Criden had never met Schwartz, and he contrived to obtain an introduction through two intermediaries. He informed them that one of his clients wished to use Schwartz as a consultant. He then paid the intermediaries $3,000 for arranging the introduction.

On January 23, 1980, Schwartz made his first and only appearance on this stage. He met with Criden and agent Wald at the hotel. Criden informed Wald that he had discussed the project with Schwartz. Schwartz spoke enthusiastically of the positive business environment in Philadelphia. When the conversation turned to the question of obtaining zoning variances in advance of construction, Schwartz indicated that he controlled the City Council, as well as the Zoning Board of Adjustment and the Board of Building Standards.

Wald mentioned that his client had other investments in mind besides the hotel construction and asked whether Schwartz could "suggest" a local, politically savvy law firm. When Criden suggested Schwartz's former law firm, Blank, Rome, Comiskey & McCauley (Blank, Rome), Wald inquired whether that would create a conflict of interest. Schwartz replied that he had completely severed his relationship with the firm. He commented that the firm had expertise in all types of construction and financing and would be a proper firm to use for this kind of work. Criden offered to set up an appointment with the firm and to make the referral. Schwartz also suggested another major Philadelphia law firm, Wolf, Block, Schorr and Solis-Cohen. With respect to using his old law firm, Schwartz commented that "[t]here are certain protocol that should be worked out in advance and that's where the law firm Howard [Criden] will become involved. To put it together so that it doesn't boomerang."

Wald asked Schwartz if the "dollars we're talking are in the right ballpark." Schwartz replied that money was not his prime concern, and that his interest was in Philadelphia's economic and tax development. He confirmed Wald's statement that they had made a business deal and that the sheik had a friend in Philadelphia. Wald then handed Schwartz an envelope containing $30,000 and asked him if the sum was "appropriate." Schwartz took the envelope and departed, but not before advising Wald that he was "very much available" if the sheik required his future services. Following Schwartz's departure, Wald gave Criden the $5,000 he had previously promised him for Schwartz's "delivery."

Schwartz made his debut in this alleged conspiracy on January 23, 1980, and the record shows no further meetings between him and the agents. The day after the agents met with Schwartz, Criden arranged to have Jannotti meet with them. They met that evening and the agents again described the project. Jannotti promised to help. Wald then handed Jannotti an envelope with $10,000 and Jannotti left.

### III.

Although the entire hotel project was imaginary, the law of this case is, as the majority has noted, that there is Hobbs Act jurisdiction. *See United States v. Jannotti*, 673 F.2d 578 (3d Cir.) (in banc), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). On the record we have here, the conduct of Schwartz and Jannotti provides sufficient evidence to convict each of them of a Hobbs Act conspiracy. But whether the Government proved that Schwartz is also guilty of the RICO charge is an entirely different question. I believe the answer is that it did not.

The thrust of the statute, as is indicated by its title "Racketeer Influenced and Corrupt Organizations Act" and the language of sections 1962(a), (b), and (c), is the perversion of a business, organization, or enterprise through a pattern of racketeering activity. The principal purpose of Congress in enacting RICO was to protect legitimate businesses from the infiltration by organized crime by eradicating "the criminal means of acquiring, maintaining and conducting any enterprise affecting com-

**230**

merce." *United States v. Stofsky*, 409 F.Supp. 609, 613 (S.D.N.Y.1973).[1]

This purpose is demonstrated by the very structure of the statute's operative provisions. As to enterprises engaged in interstate commerce, section 1962(a) prevents the use or investment of racketeering income in the acquisition of any interest in such an enterprise. Section 1962(b) makes it unlawful through a pattern of racketeering activity to acquire a direct interest in or control of such an enterprise. Section 1962(c) reaches employees and persons already associated with the enterprise and prohibits them from conducting its affairs through a pattern of racketeering activity. The statute also provides severe mandatory forfeiture penalties for a section 1962 violation. 18 U.S.C. § 1963(a).[2]

The gravamen of a section 1962(d) RICO offense is not a conspiracy to commit bribery or some other predicate offense, but a conspiracy to operate or participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity. The enterprise concept, a distinct element, is the focus of the RICO crime. "Although the provisions create a cluster of substantive offenses, a RICO violation, broadly speaking, arises from the use of power, acquired by crime, to gain or maintain a foothold in an enterprise that operates in interstate commerce." Bridges, *Private RICO Litigation Based Upon "Fraud in the Sale of Securities,"* 18 Ga.L.Rev. 43, 48 (1983) (hereinafter cited as "Private RICO Litigation") (footnote omitted). Thus, the court of appeals in *United States v. Mandel*, 591 F.2d 1347 (4th Cir.), *vacated on other grounds*, 602 F.2d 653 (1979) (in

banc) (district court's order granting judgment N.O.V. on the RICO charge undisturbed), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980), approved the district court's holding "that the 'conduct or participate' language in section 1962(c) required some involvement in the *operation or management* of the business ...." 591 F.2d at 1376 (emphasis added). Section 1962(c) "requires more than merely some connection or even a 'substantial nexus' between a lawful enterprise and the prohibited pattern of racketeering." *United States v. Webster*, 639 F.2d 174, 185 (4th Cir.), *cert. denied*, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981), *modified* 669 F.2d 185 (1982).

In discussing what constitutes a conspiracy under RICO, this court in *United States v. Riccobene*, 709 F.2d 214 (3d Cir.), *cert. denied*, ─── U.S. ───, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983), reasoned that:

> An agreement merely to commit the predicate offenses would not be sufficient to support a RICO conspiracy. Nor is it sufficient if the defendants merely participate in the same enterprise.... This is so because, under RICO, it is an agreement "to conduct or participate ... in the conduct of [an] enterprise's activities" through the commission of predicate offenses that is prohibited, not an agreement to commit a pattern of racketeering activity alone.

Id. at 224. This statement in *Riccobene* reflects the fear that Congress had that organized crime could obtain a foothold in the commerce and industry of the country and from there "intimidate all competition out of the market. The results of this

---

1. "Title IX is aimed at removing organized crime from our legitimate organizations .... Unless an individual not only commits such a crime but engages in a pattern of such violations, and uses that pattern *to obtain or operate* an interest in an interstate business, he is not subject to the proceedings under Title IX." 116 Cong.Rec. 585 (1970) (emphasis added), *quoted in* Note, *Organized Crime and the Infiltration of Legitimate Business: Civil Remedies for "Criminal Activity,"* 124 U.Pa.L.Rev. 192, 205 n. 74 (1975).

2. "A close reading of § 1962 ... reveals that subsections (a), (b), and (c) are designed to work together to deal with the three different ways in which organized crime infiltrates and corrupts legitimate organizations.... All three sections considered together represent a unified plan to deal with the infiltration of legitimate organizations." Note, *Elliott v. United States: Conspiracy Law and the Judicial Pursuit of Organized Crime through RICO*, 65 Va.L.Rev. 109, 117 (1979); *see* H.R.Rep. No. 1549, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Ad.News 4007, 4033.

activity would be the typical antitrust vices of monopolization, price fixing and so forth." *Private RICO Litigation, supra,* at 70. These concerns were expressed during the Senate and House hearings. *Id.* at 70, n. 136. In *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), the Supreme Court recognized that a great concern of Congress in enacting RICO was "the infiltration of legitimate businesses," *id.* at 592–93, 101 S.Ct. at 2533, and resolved a much disputed question by holding that the statute also reached the operation and management of criminal enterprises.

### IV.

In this case, the indictment charges that Schwartz conspired to conduct and participate in the conduct of the affairs of an enterprise—the Criden, Johanson, Dolan, Morrissey & Cook law firm—through a pattern of racketeering activity. Proof of an agreement only to participate in a conspiracy to commit two or more predicate crimes of bribery is insufficient to establish a RICO violation. "More specifically, to convict for conspiracy to violate RICO the government must prove that the person objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the enterprise through the commission of two or more predicate crimes." *United States v. Martino,* 648 F.2d 367, 394 (5th Cir.), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982). *Accord United States v. Winter,* 663 F.2d 1120, 1136 (1st Cir. 1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 1249, 75 L.Ed.2d 479 (1983). And under *United States v. Mandel, supra,* the required proof must demonstrate "some involvement in the operation or management of the business." 591 F.2d at 1375.

Applying these principles of RICO construction, this court held in *United States v. Provenzano,* 688 F.2d 194, 200 (3d Cir.),

*cert. denied,* 459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982), that a union officer who accepted bribes in exchange for the union's countenancing of the violations by employers of collective bargaining agreements was conducting union affairs through a pattern of racketeering activity. It was the conduct of the union office that provided the requisite element for the RICO offense. The court observed, however, that "when the predicate acts are unrelated to the enterprise or the actor's association with it [then] the nexus element is missing, and consequently there is no RICO violation." *Id.* at 200. I read this language to mean that the predicate acts must be related to managing or participating in the operation of the affairs of the enterprise. The evidence does not support such a conspiracy here.

The Government might have proven that Schwartz, as president of the City Council, had conspired to conduct the affairs of the Council through a pattern of racketeering activity.[3] *United States v. Frumento,* 563 F.2d 1083 (3d Cir.1977), *cert. denied,* 434 U.S. 1072, 98 S.Ct. 1256, 1258, 55 L.Ed.2d 775, 776 (1978), could have been an analogue for such an indictment and prosecution. The Government, however, chose to indict Schwartz and Jannotti for conspiracy to conduct and participate in the conduct of the Criden, Johanson, Dolan, Morrissey & Cook law firm. There is nothing to show that Schwartz was even in the firm's office, or that he used its telephones, library, or facilities. The pertinent evidence does not prove that Schwartz had any intention or objective of conspiring to conduct or participate in the conduct of the affairs of that firm.

Further, although Criden, a partner in the firm, played a key role in inducing Schwartz to accept the bribe, the evidence demonstrates that Criden was acting in his personal capacity—not as a member of the

**3.** Evidence in support of such a conspiracy might have been found in a meeting between Criden, Schwartz, and Jannotti prior to Jannotti's meeting with Wald. Schwartz advised Jannotti that these "people ... want to be assured that they are not going to have any problems,

they want your support, want you to go up with [Criden] tonight and meet these people tonight and get your 10 thou, okay." In addition, Cook testified that Criden gave Schwartz some money for introducing Criden to Jannotti.

law firm—to pick up some fast money by merely introducing the agents to Schwartz, Jannotti, and Johanson. None of these meetings was concerned with the conduct of the affairs of the law firm. Not one bit of evidence was introduced to show any firm record of any transaction pertaining to the conspiracy to bribe. The firm never opened a record, or made a note in connection with the transactions, despite its usual practice of opening a file whenever a matter became firm business. True, Criden and Johanson shared some of the money with Cook, a partner, but they shared the money among themselves and not with the firm. They placed the funds in a special safe deposit box. Neither the monies they received, nor the safe deposit box in which they stored the cash, were registered with the firm. The safe deposit box, opened the year before, had been registered in the individual names of Criden and Cook and only they had access to it. They later added Johanson's name. The record demonstrates that the box did not belong to the firm.[4]

The record discloses that at all times Criden acted on his own—not in his capacity as a member of the law firm—in dealing with Wald and his mythical sheik. Criden engaged in a pattern of racketeering activity for Criden personally, not in behalf of the law firm or in the name of the law firm. He involved Johanson in his capacity as a member of the City Council, not in his role as a member of the law firm. He sought nothing from Johanson that involved the firm. Although he directed Cook to withdraw $3,000 from the safe deposit box,

Criden instructed Cook that this money was to be advanced to pay bills of the firm.[5] This "advance" by Criden to meet a cash shortage in the firm is hardly evidence that Schwartz conspired to conduct the firm's affairs "through a pattern of racketeering activity."

Even if Criden were engaged in RICO racketeering activity, Schwartz's and Jannotti's limited association with him does not *ipso facto* make them guilty of a RICO conspiracy unless they conspired with him to violate the substantive provisions of section 1962(c). Although Schwartz's betrayal of the public trust is indefensible, his recommendation of a law firm to represent the sheik does not expand a conspiracy to violate the Hobbs Act into a RICO conspiracy. Wald asked Schwartz to "suggest" a law firm to handle legal work for his principal and Schwartz gave him the names of the firm of Blank, Rome and the firm of Wolf, Block, Schorr & Solis-Cohen. Wald made no selection but Criden intended to push the legal business to Blank, Rome, perhaps in the hope that he might obtain a "referral fee." During a luncheon a week later with a Blank, Rome partner, Schwartz mentioned the recommendation that he had made in connection with the projected hotel complex and suggested that Criden might want to participate in fees. The evidence shows that Criden's expectation of a financial benefit from the legal work presumably to be accomplished by Blank, Rome was not for any legal services to be performed by Criden or his law firm, but was merely a form of "referral fee" to accrue to him personally. Furthermore, as Schwartz

---

4. Cook testified on cross examination:
 Q: And when that safe deposit box was opened, it was not opened in the name of the law firm of Criden, Johanson, Dolan, Morrissey & Cook, is that correct?
 A: Yes sir.
 Q: And, specifically, what was the name under which that safety deposit box was opened when it was initially opened?
 A: I don't know. It was Criden and Cook, or through Criden & Ellis Cook, but was the two of us.
 Q: Whichever one it was specifically not in the name of the firm, but in the name of you and Mr. Criden?

A: Yes sir.
 * * * * * *
 Q: And at no time was that box in the name of—I don't want to repeat that whole long name of the law firm—
 A: No, it was not sir.
 (621A)

5. These funds were not transmitted to the law firm as fees or income, as the majority seems to suggest, *supra* at 227 n. 4, but were merely a unilateral "advance" by Criden personally.

pointed out in his luncheon conversation, "Mr. Criden's firm could not participate in the legal representation of this enterprise, nor could Mr. Criden." The suggestion of the Blank, Rome or Wolf, Block law firms is not evidence of any intention by Schwartz to conduct the affairs of the Criden, Johanson firm.

There is not the slightest evidence that Schwartz conspired to conduct the affairs of the firm when he accepted a payoff from Wald. The purpose of the January 23 meeting with Schwartz was solely to have him accept a personal bribe. The separate meetings with Johanson and Jannotti had a similar purpose. The undercover agents enlisted Criden's services only because they knew from their prior Abscam dealings with him that he would be a willing tool in setting up Philadelphia councilmen for the bribery "sting." Even though Criden did not know Schwartz or Jannotti, he contrived to meet them and separately introduce them to the agents to advance the bribery plans. In each instance, the councilmen were on venal journeys of their own; none of the journeys entailed conducting the affairs of the firm of Criden, Johanson, Dolan, Morrissey & Cook. Rather than revealing a conspiracy to conduct the affairs of the firm through a pattern of racketeering activity, the record shows that the essence of the conspiracy was to bribe Schwartz and Jannotti in return for illegal favors from the City Council.

## V.

In conclusion, I would affirm the conviction of the appellants under the Hobbs Act. I would reverse Schwartz's conviction under the RICO Act and remand to the district court with directions to dismiss count II (the RICO count) of the indictment.