**UNITED STATES of America**

v.

**INADI, Joseph.**

**Appeal of Joseph INADI.**

No. 83–1882.

United States Court of Appeals,
Third Circuit.

Argued July 20, 1984.

Decided Nov. 13, 1984.

As Amended Nov. 27, 1984 and
Feb. 8, 1985.

Rehearing and Rehearing In Banc
Denied Feb. 8, 1985.

Before ADAMS, HIGGINBOTHAM and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

Defendant Joseph Inadi appeals from his conviction on charges arising out of an alleged conspiracy to manufacture and distribute narcotics. Disposition of this appeal requires that we resolve a recurring question that has twice eluded determination by this court, *see United States v. Gibbs*, 739 F.2d 838 (3d Cir.1984) (in banc); *United States v. Ammar*, 714 F.2d 238 (3d Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983): Does the sixth amendment require the government to show that a non-testifying coconspirator is *unavailable* to testify, as a foundation for admitting that coconspirator's out-of-court statements under Federal Rule of Evidence 801(d)(2)(E)? We hold that the Confrontation Clause does require such a showing, and because in our view the government has not met this burden we will reverse the judgment of the district court.

### I.

Joseph Inadi was indicted in the Eastern District of Pennsylvania on charges of conspiring to manufacture and distribute methamphetamine, and on four related narcotics charges. The conspiracy count alleged that Inadi combined with John Lazaro, Jr., Michael McKeon, William Levan and other persons known and unknown. The government later named Marianne Lazaro—John Lazaro's wife—as the only additional unindicted coconspirator.

The government's case featured the testimony of two unindicted coconspirators and two Drug Enforcement Agency (DEA) agents, as well as five telephone conversations recorded through a tap on the Lazaros' phone. Unindicted coconspirator Michael McKeon testified, under a grant of use immunity, that he approached Inadi in September of 1979, when McKeon was seeking a distribution "outlet" for methamphetamine. Under an agreement they reached, Inadi was to supply cash and chemicals for the manufacture of methamphetamine and was also to be responsible for distribution, while McKeon and William Levan were to actually manufacture the substance.

McKeon testified that he and Levan made three attempts to manufacture ("cook") methamphetamine in Philadelphia between December of 1979 and April of 1980. The first cook was successful, producing three pounds of methamphetamine, which McKeon later delivered to Inadi. McKeon, Levan, and Inadi shared a profit of $19,500 on that transaction. The second cook failed to produce methamphetamine because the phenyl-2-propanol ("P2P") supplied by Inadi—a necessary ingredient—turned out to be some other substance. A third cook succeeded in producing three-and-one-half pounds of methamphetamine, which Levan delivered to Inadi.

According to McKeon, sometime after the third cook, probably in May of 1980, he went to Cape May, New Jersey with the liquid residue from the third cook. There he met Levan, Inadi, and John Lazaro, as well as two others not named as conspirators, at an empty house McKeon understood to be rented through Lazaro. They attempted to extract additional methamphetamine from the liquid residue. This "drying" resulted in less than an ounce of low quality product, which McKeon promptly sold for $200. In the early morning hours of May 23, 1980 two Cape May Police Officers surreptitiously entered the house pursuant to a warrant and removed a tray covered with drying methamphetamine. With permission of the issuing magistrate the officers delayed returning an inventory, leaving the participants to spec-

ulate over what had happened to the missing tray.

DEA agents Ellis Hershowitz and Nicholas Broughton testified that they observed a meeting between John Lazaro and Inadi on May 25, 1980. Lazaro and Inadi stood alongside Lazaro's car in the parking lot at "Frankie Masters" Restaurant in Philadelphia and spoke for several minutes. Agent Broughton testified that he saw Inadi lean into Lazaro's car during this meeting. After Lazaro drove off the DEA agents overtook and stopped the car. They searched the vehicle, as well as Lazaro and his wife Marianne, who was a passenger at the time. Finding nothing, the agents allowed the Lazaros to leave. Some eight hours later Agent Hershowitz returned to the scene of the stop and search and found a clear plastic bag containing a small quantity of a white powder later identified by a government expert as methamphetamine.

Under a grant of use immunity, Marianne Lazaro testified that she was seated in the Lazaro car throughout the May 25, 1980 meeting between Inadi and John Lazaro. She did not see Inadi lean into the car. She further testified that after the meeting with Inadi her husband handed her a clear plastic bag containing white powder, which she put in her bra. While the DEA agents were searching the car, Marianne Lazaro removed the bag from her bra and threw it away. She denied that the bag and powder found by Hershowitz, and introduced as a government exhibit, were the items that her husband had given her.

The linchpins of the government's case were five telephone conversations recorded between May 23 and May 27, 1980 by the Cape May County Prosecutor's Office as part of their own investigation of Lazaro. The jury heard three conversations between Inadi and John Lazaro—one recorded on May 23, in which Lazaro seems to ask, in code, for a quantity of methamphetamine for the weekend, and reports on the residue missing from the Cape May house, suggesting that "Mike" probably took it; another recorded on the morning of Sunday, May 25 arranging the meeting at

Frankie Masters; and one recorded on May 27 in which Lazaro reports that he kicked "that piece" under his car during the May 25 DEA stop, and wonders how the agents were tipped off.

In a conversation between McKeon and Marianne Lazaro recorded on May 27, she describes the May 25 incident and suggests that Inadi might have set them up. McKeon assures her that Inadi was not an informant. In a May 27 conversation between John Lazaro and William Levan, there is further discussion of the missing Cape May residue (with Lazaro again suggesting that "Mike" took it), and more speculation over who set Lazaro up for the May 25 stop.

The district court admitted Inadi's recorded statements as admissions of a party-opponent under Fed.R.Evid. 801(d)(2)(A), and the recorded statements of McKeon, Levan, and the Lazaros as coconspirators' admissions under Fed.R.Evid. 801(d)(2)(E). All were received as substantive evidence over the strenuous objections of defense counsel. Shortly after listening to the May 27 Lazaro/Levan conversation for the second time, the jury returned a verdict of guilty on all counts against Inadi.

II.

In this appeal, Inadi contends: (1) that the tape recordings were inadmissible because the government failed to prove their authenticity; (2) that use of John and Marianne Lazaros' recorded statements for the truth of what they asserted was contrary to Fed.R.Evid. 801(d)(2)(E), because there was insufficient independent evidence that they were coconspirators; and (3) use of John Lazaro's recorded statements violated the Confrontation Clause, in that Lazaro was neither produced to testify in court nor shown to be unavailable to testify. We will consider each of Inadi's contentions in turn.

A.

Inadi challenges the admissibility of all five tape recordings played at trial on the grounds that the government failed to meet the authentication requirements of

*United States v. Starks,* 515 F.2d 112, 121 (3d Cir.1975) (requiring the government to produce clear and convincing evidence of authenticity as a foundation for admitting tape recordings) and 18 U.S.C. § 2518(8)(a) (1982) (requiring the presence of a seal made under judicial direction, or a "satisfactory explanation for the absence thereof," as a prerequisite to using wiretap recordings as evidence). The district court rejected these contentions after a pretrial evidentiary hearing.

The record shows that the original tapes were properly sealed under judicial direction and placed in the evidence vault at the county prosecutor's office upon completion of the Lazaro wiretap on June 9, 1980, but that they were inadvertently unsealed on December 29, 1980 by Cape May County Detective Andrew R. Vaden. Detective Vaden mistook the originals for work copies that were also stored in the vault, and he played them for defense attorneys involved in related New Jersey prosecutions. The tapes were then returned to the vault and, upon discovery of the error, resealed on January 29, 1981. Inadi does not challenge the government's explanation for the inadvertent unsealing, but rather argues that there was an unexplained break in the chain of custody—another unsealing—prior to December 29. Inadi points to testimony that the tapes were originally sealed in bundles of five, wrapped in clear cellophane (or "scotch") tape, and that all the bundles were placed in a sealed outer cardboard carton. He compares this to the testimony of Detective James R. Brennan—the evidence custodian—that when he first saw the tapes in the evidence vault on June 10, 1980 the outer carton may have been open, and the testimony of Detective Vaden that the tapes were sealed with grey "duct" tape on December 29, 1980.

 We do not, however, find that the record is unambiguous as to whether the outer carton was formally sealed under judicial direction, nor do we believe that this extra precaution would be necessary. Moreover, we believe that in the light of detailed testimony that the tapes were subject to appropriate security, the district court was justified in discounting Detective Vaden's testimony regarding the type and color of the sealing tape. The very fact that Detective Vaden did not notice that, as the record clearly shows, each individual tape box and plastic reel was marked "original" suggests that his attention on December 29, 1980—nearly three years before he testified—was not focused on the physical condition of the evidence. (Detective Brennan testified that he really did not think about which set of tapes he was giving to Vaden, and Vaden testified that he assumed Brennan would not give him the originals.) The fact that the tapes were resealed with grey duct tape on January 29, 1981 might be the source of confusion. Thus, though the handling of this evidence was less than exemplary, we cannot say that the district court erred in finding that the government had met its burden under *Starks* and § 2518.

### B.

Inadi next contends that the recorded statements of John and Marianne Lazaro were inadmissible hearsay. The Federal Rules of Evidence exclude from their definition of hearsay [1] any out-of-court statement that is "offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). This court has held that out-of-court statements may not be admitted as substantive evidence under this rule unless the government has established the existence of the alleged conspiracy and the connection of the declarant to it "by a clear preponderance of evidence independent of the hearsay declarations." *United States v. Continental Group,* 603 F.2d 444, 457 (3d Cir.1979), *cert. denied,* 444 U.S. 1032,

---

1. "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

Fed.R.Evid. 801(c).

100 S.Ct. 703, 62 L.Ed.2d 668 (1980). Without the requirement of independent proof of a conspiracy, "hearsay would lift itself by its own bootstraps to the level of competent evidence," *Glasser v. United States,* 315 U.S. 60, 75, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942). We find that the district court applied the correct legal standard in determining the admissibility of the Lazaro statements, and our review is limited to the question of whether, viewing the evidence in the light most favorable to the government, the district court had "reasonable grounds" for concluding that, more probably than not, John and Marianne Lazaro were coconspirators. *United States v. Jannotti,* 729 F.2d 213, 218 (3d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984).

■ In determining whether there was enough independent evidence that the Lazaros were coconspirators to bring their statements within the hearsay exception, we are mindful that "this element in the exception coincides with the elements that comprise the crime of conspiracy," Mueller, *The Federal Coconspirator Exception: Action, Assertion, and Hearsay,* 12 Hofstra L.Rev. 323, 335 (1984) (footnote omitted). We therefore review some basic principles of the substantive law of conspiracy.

■ The *agreement* to commit an unlawful act is itself the act proscribed by the crime of conspiracy. "It is enough if the parties tacitly come to an understanding in regard to the unlawful purpose, and this may be inferred from sufficiently significant circumstances ...." R. Perkins & R. Boyce, *Criminal Law* 684 (3d ed. 1982) (footnote omitted); *see also United States v. Georga,* 210 F.2d 45 (3d Cir.1954). The mental element of conspiracy is twofold: there must be both intent to conspire and intent to commit the underlying offense. *United States v. United States Gypsum Co.,* 438 U.S. 422, 443 n. 20, 98 S.Ct. 2864,

2877 n. 20, 57 L.Ed.2d 854 (1978). "[A]iding a conspiracy with knowledge of its purposes suffices to make one a party to the conspiracy." W. LaFave & A. Scott, *Handbook on Criminal Law* 463 (1972). Finally, we note that where a number of parties combine to manufacture, distribute, and retail narcotics there is a single conspiracy—a so-called "chain" conspiracy—despite the fact that there has been no direct contact whatsoever amongst some of its links. *Id.* at 480–81.

■ Against this background, we cannot say that the district court lacked reasonable grounds, based on nonhearsay evidence, for concluding that the Lazaros were probably Inadi's coconspirators. There was in-court testimony that John Lazaro was present at the Cape May drying, and that he had rented the empty house where it took place.[2] There was direct testimony of a meeting between Inadi and Lazaro, and sufficient circumstances to permit the inference that a quantity of methamphetamine passed between them on that occasion. We believe that this evidence constituted reasonable grounds for concluding that John Lazaro was probably a link in the chain of methamphetamine distribution and was therefore Inadi's coconspirator.

■ The nonhearsay evidence of Marianne Lazaro's participation was somewhat weaker. We have only her testimony that after the meeting with Inadi her husband asked her to hold a bag of white powder, that she put the bag in her bra, and that she threw the bag away while DEA agents were searching the Lazaro car. Though she professed not to know what the white powder was or where her husband had obtained it, when she was asked if there were "drugs in the car at the time that the Federal agents stopped the car?" she responded, "I had a white plastic bag with a white powder in it." App. at 732. We

---

2. Inadi now contends that Michael McKeon's testimony on this point may itself have been inadmissible hearsay. We do not find, however, that defense counsel made a contemporaneous objection that would have enabled opposing counsel to clarify the source of McKeon's knowledge. We therefore deem this contention to be waived on appeal. Fed.R.Evid. 103(a). *See also United States v. Gibbs,* 739 F.2d 838, 849–50 (3d Cir.1984) (in banc).

believe that her behavior could reasonably support the inference that she knowingly came to the aid of the conspiracy, and thereby became still another link in the chain that extended back to the defendant Inadi.

■ In addition to independent evidence that the declarants conspired with the defendant, Rule 801(d)(2)(E) requires that the proffered statements be "during the course and in furtherance of the conspiracy." There is no indication in the record that the conspiracy had been abandoned during the period of May 23–27 when the recordings were made; indeed this appears to have been a time of peak activity. We also find that the "in furtherance" requirement has been met. Two of the conversations apparently involved arrangements for a drug transaction that was an integral part of the conspiracy count. The others—although they contained some extraneous matter—served to "provide reassurance, ... to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy ...." *Ammar,* 714 F.2d at 252. We conclude, therefore, that the government laid the foundation for admission of the Lazaros' out-of-court declarations required by Fed.R.Evid. 801(d)(2)(E). We now turn to Inadi's constitutional claim.

## C.

■ The sixth amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him ...." U.S. Const. amend. VI. Although the Confrontation Clause has never been construed to bar all use of out-of-court statements as evidence of criminal guilt, *Dutton v. Ev-*

*ans,* 400 U.S. 74, 80, 91 S.Ct. 210, 215, 27 L.Ed.2d 213 (1970), it is clear that it imposes requirements separate from, and sometimes more stringent than, the hearsay rule and its many exceptions, *see Ohio v. Roberts,* 448 U.S. 56, 63–65, 100 S.Ct. 2531, 2537–2539, 65 L.Ed.2d 597 (1980). We recently acknowledged that "no exact equation exists between Fed.R.Evid. 801 and the Confrontation Clause, ... thereby raising the possibility that evidence that satisfies Fed.R.Evid. 801(d)(2)(E) could still be deemed inadmissible under the constitutional test." *Gibbs,* 739 F.2d at 847. Inadi argues that the government, as the proponent of the tape-recorded out-of-court statements, was constitutionally required to either produce the declarants for cross-examination,[3] or to establish that they were *unavailable* to testify in court. We agree that the government must meet this burden.

■ In *Roberts* the Supreme Court held that "in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case ... the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." 448 U.S. at 65, 100 S.Ct. at 2538. Though the government argues that it is not required to show the unavailability of a nontestifying coconspirator-declarant, it does not suggest any reason why we should create an exception to the clear constitutional rule laid down in *Roberts.*[4] We, too, are unable to find any reason for the exception to the unavailability requirement the government would have us adopt. Indeed, with commentators increasingly of the view that the broad coconspirator exception to the hearsay rule can only be

---

**3.** "[T]he Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination." *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970).

**4.** The Supreme Court did suggest, in a footnote, that "[a] demonstration of unavailability ... is

not always required." 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7. As an example, the Court cited *Dutton,* where the "utility" of trial confrontation was "so remote that it did not require the prosecution to produce a seemingly available witness." *Id.* The government, however, does not rely on this exception, and we do not find it applicable here.

justified as a matter of necessity [5]—that is, necessitated by the difficulty of proving conspiracy and related offenses—it does not seem unreasonable to require the government to demonstrate that its hardship is real before availing itself of this tremendous evidentiary advantage. We therefore hold that the government must show that a nontestifying coconspirator is *unavailable* to testify as a foundation for admitting that coconspirator's out-of-court statements under Fed.R.Evid. 801(d)(2)(E). *Accord, United States v. Lisotto,* 722 F.2d 85 (4th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1682, 80 L.Ed.2d 157 (1984); *United States v. Ordonez,* 722 F.2d 530 (9th Cir.1983). Of course, under our decision in *Gibbs, supra,* a defendant must make a specific and timely objection to preserve the unavailability issue for appeal. It is clear that Inadi has done so here.

### III.

The government contends that even assuming, as we have now held, that it bears the burden of producing the coconspirator-declarants or proving that they are unavailable, they have met that burden in this case. Thus we must determine what constitutes a showing of "unavailability" sufficient to satisfy the Confrontation Clause in this case.

We believe that Fed.R.Evid. 804(a), which defines "unavailability" for the hearsay exceptions that have traditionally required such a foundation in both civil and criminal cases, is an appropriate starting point. It provides:

> "Unavailability as a witness" includes situations in which the declarant—
>
> (1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement; or
>
> (2) persists in refusing to testify concerning the subject matter of his

statement despite an order of the court to do so; or

> (3) testifies to a lack of memory of the subject matter of his statement; or
>
> (4) is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or
>
> (5) is absent from the hearing and the proponent of his statement has been unable to procure his attendance ... by process or other reasonable means.

Under *Barber v. Page,* 390 U.S. 719, 724–25, 88 S.Ct. 1318, 1321–22, 20 L.Ed.2d 255 (1968), a case involving the admissibility of former testimony, "absence" of a witness will not constitute "unavailability" for purposes of applying the Confrontation Clause "unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." In *Barber,* which arose out of a state prosecution in Oklahoma, the hearsay declarant was in a federal prison in Texas. The prosecutors did not seek a writ of habeas corpus *ad testificandum* from either the state or federal courts, although both routes were available. "The right of confrontation," the Court said, "may not be dispensed with so lightly." 390 U.S. at 725, 88 S.Ct. at 1322.

We believe that Rule 804(a) and *Barber,* together, establish the *minimal* showing of unavailability that will satisfy the Confrontation Clause. It is clear that with respect to John Lazaro [6] the government has failed to meet even this minimum threshold.

The government has taken, at various stages in these proceedings, several different approaches to establishing John Lazaro's unavailability. It first asked the trial judge to rely on the assurances of government counsel that Lazaro was adamantly refusing to testify and was prepared to go to jail for contempt. In the context of this

5. *See, e.g.,* 4 J. Weinstein & M. Berger, *Weinstein's Evidence,* 801–169 to –171 (1981); Mueller, *The Federal Coconspirator Exception: Action, Assertion, and Hearsay,* 12 Hofstra L.Rev. 323, 335 (1984); Levie, *Hearsay and Conspiracy: A Reexamination of the Co-Conspirators' Exception to the Hearsay Rule,* 52 Mich.L.Rev. 1159, 1166 (1954).

6. Of the other coconspirators whose out-of-court statements were used, Michael McKeon and Marianne Lazaro both testified at trial under grants of immunity, and William Levan appeared and, outside the presence of the jury, properly asserted his fifth amendment privilege.

case, such assertions are not sufficient. Such predictions by government counsel cannot be recognized as the equivalent of the actual scenario where a witness has appeared in court and refused to testify after a court order. Every veteran trial judge has experienced the situation where a hostile witness discards his "stonewalling" tactics when faced with an imminent contempt citation.

When Lazaro failed to appear under a subpoena issued at the district court's suggestion, the government reported that he was prevented from attending by car troubles. For example, government counsel did not request a bench warrant, nor does it appear that they made any additional effort to compel his attendance at trial. We can safely assume that counsel's conduct would have been considerably more aggressive had counsel felt it was necessary in order to "win". Under such circumstances, counsel would have sought a bench warrant and refused to assume that the judicial process is so impotent that a witness' hostility is a basis for making no effort. Counsel's efforts here clearly do not constitute a "good faith effort" under *Barber*.

Finally, on appeal the government asks us to take judicial notice that Lazaro probably could have asserted his fifth amendment privilege had he appeared. Even if we were inclined to consider this position, which was never asserted below, we would not find an adequate showing of unavailability absent an actual assertion of privilege and exemption by ruling of the court. Unlike defendants, witnesses have no blanket right to stand mute; we cannot say on the basis of this record that John Lazaro would have asserted the fifth amendment privilege.[7] We conclude that the government failed to show that John Lazaro was unavailable to testify, and therefore the district court erred in admitting his out-of-court statements.[8]

## CONCLUSION

For the reasons set forth above, the judgment of conviction will be reversed and the case remanded for further proceedings consistent with this opinion.

---

7. Of course, we decide this case on the basis of the record before us, where the declarant had not asserted the privilege before any judicial officer or anyone authorized to take oaths. We do not deal with any exceptional circumstance where the trial judge has a record—for example, in the form of an affidavit—that clearly establishes that the declarant would claim the privilege and that requiring him to appear in court would be a meaningless formality. Thus, there is an ambit of discretion reserved to the district judge contingent upon the specific facts of the case.

8. Inadi has raised a number of other claims of error. In view of our disposition of the Confrontation Clause claim, we find it unnecessary to reach the merits of these other issues.