**UNITED STATES of America**

v.

**CAPUTO, Fiore, a/k/a "Curly".**

**Appeal of Fiore CAPUTO.**

**No. 82–1791.**

United States Court of Appeals, Third Circuit.

Argued Jan. 9, 1984.

Decided March 29, 1985.

As Amended April 17, 1985.

---

Betty A. Lawler (argued), Bala Cynwyd, Pa., for appellant.

Edward S.G. Dennis, Jr., U.S. Atty., Walter S. Batty, Jr. (argued), Glenn B. Bronson, Asst. U.S. Attys., Philadelphia, Pa., for appellee.

Before ALDISERT, Chief Judge, and HIGGINBOTHAM and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

Defendant Fiore Caputo (also known as "Curly") appeals from his conviction of conspiracy to distribute methamphetamine. Once again this court must determine whether the out-of-court statements of an alleged coconspirator were properly admitted under Fed.R.Evid. 801(d)(2)(E) and the sixth amendment. Because the government failed to produce the coconspirator-declarant to testify in court, and did not meet its concomitant burden of showing that he was unavailable to testify, we will reverse the judgment of the district court.

### I.

In an indictment handed down on April 21, 1982, Fiore Caputo was charged with conspiracy to distribute methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. § 846 (1982). James DiPasquale, Anthony Canale, and Thomas Cook were indicted as coconspirators, and on several related substantive charges. DiPasquale and Canale pleaded guilty to all counts against them. Caputo and Cook went to trial in July of 1982. That proceeding ended with a hung jury. They were retried and convicted on September 3, 1982.

The government's case against Caputo featured, among other evidence, the testimony of Anthony Canale, who testified pursuant to a plea bargain, John Bocella, a drug-user and dealer who was cooperating with law enforcement authorities, and Detective Timothy Woodward, an undercover officer with the Montgomery County District Attorney's office. A recorded phone conversation between Woodward and DiPasquale, that implicated Caputo, was also introduced.

Briefly summarized, the evidence at trial, viewed in the light most favorable to the government, showed the following: At some time in the fall of 1981, Anthony Canale met Caputo at a bar to discuss renting an apartment in a building owned by Caputo's mother. Canale brought along a friend of his, James DiPasquale. After the rent for the apartment was negotiated, the conversation turned to the subject of methamphetamine. DiPasquale told Caputo, according to Canale's testimony, that he had a connection for methamphetamine, that that was what he was "into", and that there was "money in[ ] it".

On December 11, 1981, Bocella—who owed DiPasquale $2400 and who was receiving threats of bodily harm from DiPasquale if he did not repay—approached Detective Woodward about cooperating with drug enforcement authorities in an investigation of DiPasquale. Bocella brought Woodward (who used the name "Anthony") to the King of Prussia Plaza Shopping Mall, where they met DiPasquale and Canale (who served as DiPasquale's driver). Woodward gave DiPasquale $1800 for one-and-a-half ounces of methamphetamine, and $600 in partial payment of Bocella's debt. On December 14, 1981, DiPasquale told Caputo that he needed money in order to obtain methamphetamine for another transaction. Caputo arranged for his mother to lend DiPasquale $700. On December 16th Canale and DiPasquale met Bocella and Woodward at a Horn & Hardart restaurant in the Bala Cynwyd Shopping Center. Woodward gave DiPasquale over $2800 in exchange for three-and-a-half ounces of methamphetamine. Canale and DiPasquale split the money with Caputo.

Sometime in late December, Caputo and Canale went to the Howard Johnson's on City Line Avenue in Philadelphia to meet Bocella. Bocella had not been sure how much money he would be able to bring, and Canale and Caputo did not bring any meth-

amphetamine. The three went to the basement of Caputo's apartment building where they weighed out a quantity of methamphetamine which was sold to Bocella for $1000.

Canale testified that on January 8, 1982, he obtained an ounce of methamphetamine from Caputo "on consignment". On the 9th he sold this ounce to Woodward in a van parked at a McDonald's in West Conshohocken. Woodward testified that he gave Canale $1700 for the methamphetamine and $200 in payment on Bocella's debt to DiPasquale. The following day, Bocella paid Caputo for the methamphetamine he had taken on consignment.

On January 14, 1982, Detective Woodward telephoned Canale to arrange another purchase of methamphetamine. Canale told him that DiPasquale and Caputo were attempting to obtain a quantity of the substance. Woodward also spoke directly with DiPasquale by telephone in an attempt to purchase four ounces. No transaction took place that day, since neither DiPasquale nor Caputo was able to obtain methamphetamine.

On January 17th, Canale obtained two ounces of methamphetamine from Caputo. Canale added two ounces of Vitamin C crystals to the substance and the following day sold it to Woodward for $3200. Canale gave Caputo $1600 from the proceeds of this sale. On February 6th Canale obtained another ounce from Caputo to sell to Woodward. Caputo was reluctant, because DiPasquale had been arrested the previous day and Caputo suspected that Woodward was responsible. Canale was arrested when he went to make the sale. It was not until March 30, 1982 that Drug Enforcement Agency agents determined that Caputo was the "Curly" whose name had surfaced repeatedly during their joint investigation with the Montgomery County District Attorney.

The evidence against Caputo included a number of out-of-court statements by DiPasquale that were admitted as "coconspirator admissions" under Fed.R.Evid. 801(d)(2)(E). With regard to the December 16, 1981 transaction at the Horn & Hardart Restaurant, Canale, Bocella, and Woodward each testified that, as they were leaving, DiPasquale said something about bringing some soup back for "Curly", who was not feeling well. According to Bocella, DiPasquale said, "we'd better go because Curly was waiting." Woodward testified that DiPasquale "also stated that he, at one time, went to get $700 from Curly—had to go to Curly's employer to get the money and it was Curly's money." In a phone conversation between DiPasquale and Woodward recorded on January 14, 1982, and played for the jury, DiPasquale twice refers to his "partner Curly". Finally, Woodward and Bocella testified to meeting DiPasquale at a restaurant in Willow Grove on January 29, 1982. According to Woodward, after dinner DiPasquale said "he was expecting a call from Curly concerning a quantity of methamphetamine, and Curly would be calling him at approximately 11 p.m." The three then went to the basement of DiPasquale's home, where he received a phone call from someone he identified, according to Bocella and Woodward, as Curly. Woodward testified that after DiPasquale hung up the phone, "he said he had to call Curly back in a little while to ascertain when the methamphetamine would be coming."

## II.

■ In this appeal Caputo contends that the out-of-court statements of DiPasquale were admitted into evidence in violation of the sixth amendment's Confrontation Clause, because DiPasquale, who did not testify in court, was not shown to be "unavailable" to testify.[1] Before reaching the

---

1. Caputo also contends that these statements were improperly admitted under Fed.R.Evid. 801(d)(2)(E) because there was not a sufficient showing, based on the evidence *aliunde,* that DiPasquale and Caputo were indeed conspira-

tors. This contention need not detain us. Our review of the district court's ruling is limited to the question of whether, viewing the nonhearsay evidence in the light most favorable to the government, there were "reasonable grounds"

Confrontation Clause claim, we must first consider the threshold question of whether, under our decision in *United States v. Gibbs,* 739 F.2d 838 (3d Cir.1984) (in banc), *cert. denied,* —— U.S. ——, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985), Caputo has adequately preserved this objection for appeal.

### A.

At an in-chambers conference held prior to the beginning of the trial, counsel for Caputo made the following objections:

The[y] deal with the admissibility of certain hearsay statements made by Mr. DiPasquale about my client. I would like to preliminarily object to them, and I do so now asking your Honor to, by hindsight recall the testimony of the last time under Trowery you allowed that to go to the jury. I would like to do so on three grounds.

. . . .

Secondly, I do so upon the confrontation clause which gives my client the right to be confronted by witnesses against him being Mr. DiPasquale. Mr. DiPasquale did not testify at the last trial and we do not expect that he will at this trial.

The district court, stating that it was "unwilling to'assume that the evidence ... will be identical with the last trial," but that it hoped "there will be a certain consistency between what I did at the first trial and what I do now," did not issue a ruling *in limine.* At the end of Bocella's direct testimony, counsel for Caputo moved as follows:

I move to strike and move for a mistrial based upon the statements of this

witness as to what DiPasquale said about Curly on two specific occasions. The first was soup for Curly.... [B]y allowing it, the Court deprived my client of the right to confrontation of these circumstances.

The same argument, Your Honor, as to the mention by DiPasquale of Curly on the 29th of January, 1982, at the oriental restaurant in Willow Grove where DiPasquale was allegedly saying, "I have to call Curly," ....

The district court denied this motion. After the tape-recorded conversation between DiPasquale and Woodward was played, counsel for Caputo again rose:

I think Your Honor anticipated the Motion I made the last time. I renew it and move to strike the testimony as it relates to DiPasquale's statement about his partner, upon the same basis as I did before.... [I]t deprives my client of his right to confront Mr. DiPasquale.

If his testimony is to be offered in evidence against him at this trial, I would move to strike it and move for a mistrial because of its introduction.

. . . .

I anticipate that there will be other mentions on this tape by my client. Will it be necessary for me to come to sidebar to point every one of them out?

Could I have a continuing objection? THE COURT: You have preserved your objection.

Counsel for Caputo, at the end of Detective Woodward's testimony, again moved to strike DiPasquale's out-of-court statements. At the close of the government's case-in-chief, counsel for Caputo objected to the admission of certain exhibits, includ-

for concluding that, more probably than not, DiPasquale and Caputo were conspirators. *United States v. Jannotti,* 729 F.2d 213, 218 (3d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984). In our view, Canale's direct testimony that DiPasquale and Caputo discussed methamphetamine upon their first meeting, that Caputo arranged the financing of a transaction for DiPasquale, that Caputo and DiPasquale split the proceeds of a sale, and that Caputo and DiPasquale were "partners", as well as corroborating circumstantial evidence, was sufficient

foundation upon which DiPasquale's statements could be admitted under Rule 801(d)(2)(E). *Cf. United States v. Inadi,* 748 F.2d 812 (3d Cir. 1984); *United States v. Gibbs,* 739 F.2d 838 (3d Cir.1984) (in banc), *cert. denied,* —— U.S. ——, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985); *United States v. Jannotti, supra; United States v. Ammar,* 714 F.2d 238 (3d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); *United States v. Continental Group,* 603 F.2d 444 (3d Cir.1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980).

ing the Woodward-DiPasquale tape, as follows:

I think the two tapes in particular and also the telephone book seized from Mr. DiPasquale which is G–9, that particularly deprives my client of his right to confrontation as to Mr. DiPasquale.

In *Gibbs* the defendant-appellant, like Caputo, sought reversal of his conviction of conspiracy to distribute marijuana on the ground that a coconspirator whose out-of-court statements were admitted into evidence did not testify and was not shown to be unavailable to testify. At no time, however, during the government's case-in-chief did Gibbs object to this evidence on Confrontation Clause grounds. At the close of the government's case, Gibbs did raise a sixth amendment objection, on the ground that he had not been able to cross-examine the coconspirator-declarant. Gibbs did not, however, at that time specifically contend that the government had the burden of showing that the declarant was unavailable. Thus, we said, "it is solely by reason of Gibbs' failure to raise the issue of [the declarant's] availability before the district court, that the record is barren of any evidence of [the declarant's] unavailability." 739 F.2d at 848. We noted that under Fed.R.Evid. 103(a)(1) a proper objection or motion to strike must state "the specific ground of objection, if the specific ground was not apparent from the context." Because the unavailability argument had "eluded the Government and the district court" we could not say that it was "apparent from the context." 739 F.2d at 849.

In addition to being insufficiently specific to call the nature of the objection "to the attention of the judge, so as to alert him to the proper course of action and enable opposing counsel to take proper corrective measures." Fed.R.Evid. 103(a) advisory committee note, we found that Gibbs' objection, coming at the close of the government's case, was untimely. By postponing the objection until after the government had rested, Gibbs unnecessarily created the potential, in the event that the objection

was sustained, for delay and the possible declaration of a mistrial. 739 F.2d at 849.

■ It is clear that Caputo's Confrontation Clause objection was timely made. It was first raised, *in limine*, before the government began its case-in-chief, and was repeated each time out-of-court statements by DiPasquale were introduced, until the court granted a continuing objection, noting "[y]ou're just trying to protect your client. I note your objection and you have preserved it."

Whether Caputo's objection was sufficiently specific is somewhat more doubtful under *Gibbs*. As in *Gibbs*, we find no specific mention of "unavailability". We cannot, however, say that this is a case where the nature of the objection eluded the government and the district court, nor is it only by reason of Caputo's failure to raise the issue that the record is "barren" of any evidence of DiPasquale's unavailability. In its memorandum opinion denying Caputo's post-trial motions, the district court stated that a "demonstration of unavailability may not even be required in cases dealing with the co-conspirator exception," but held in any event that the government's "good-faith representation" that DiPasquale was not called as a witness because he would have invoked his fifth amendment privilege was a sufficient demonstration of unavailability. Thus, it is apparent that both the government and the district court understood the nature of the Confrontation Clause objection, and if the record is barren of any evidence of unavailability the reason was the district court's belief that such evidence was unnecessary, or, in the alternative, that the government's representations were sufficient to meet its burden. In these circumstances, we violate no rule of evidence or judicial economy by determining whether the district court was in error. Thus, we will proceed to the merits of Caputo's Confrontation Clause claim.

B.

The sixth amendment provides that "[i]n all criminal prosecutions, the accused shall

enjoy the right ... to be confronted with the witnesses against him ...." U.S. Const. amend. VI. The Confrontation Clause recognizes that the "opportunity to cross-examine an accuser or a critical witness is a powerful tool in the search for truth and in the assessment of guilt or innocence." *Gibbs*, 739 F.2d at 854 (Rosenn, J., dissenting). This fundamental right, which is secured by nearly all of our state constitutions as well as the federal Constitution, *McCormick on Evidence* § 252, at 749 (E. Cleary ed. 1984), is designed to prevent an accused from being convicted on the basis of testimony given out-of-court, without the benefit of

> a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand .and the manner in which he gives his testimony whether he is worthy of belief.

*Mattox v. United States*, 156 U.S. 237, 242–43, 15 S.Ct. 337, 339–40, 39 L.Ed. 409 (1895). Viewed in this light, the sixth amendment's Confrontation Clause can be seen to "stem from the same roots" as the evidentiary rule excluding hearsay. *Dut-*

*ton v. Evans*, 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27 L.Ed.2d 213 (1970) (footnote omitted). *See also* Fed.R.Evid. art. VIII introductory note ("Emphasis on the basis of the hearsay rule today tends to center upon the condition of cross-examination.").

■ The Confrontation Clause has not, however, been "construed to bar all use of out-of-court statements as evidence of criminal guilt," *United States v. Inadi*, 748 F.2d 812, 818 (3d Cir.1984). Nor has it been equated with the hearsay rule and its traditional exceptions. *Dutton v. Evans*, 400 U.S. at 86, 91 S.Ct. at 218. Rather, the Supreme Court has steered "a middle course," *Ohio v. Roberts*, 448 U.S. 56, 68 n. 9, 100 S.Ct. 2531, 2539–40 n. 9, 65 L.Ed.2d 597 (1980), that recognizes that the Confrontation Clause "imposes requirements separate from, and sometimes more stringent than, the hearsay rule and its many exceptions," *Inadi*, 748 F.2d at 818. Specifically, the Supreme Court has held that the Confrontation Clause "operates in two separate ways to restrict the range of admissible hearsay": "[W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.' " *Ohio v. Roberts*, 448 U.S. at 65–66, 100 S.Ct. at 2538–39.[2] The Court did suggest,

---

**2.** Though *Ohio v. Roberts* dealt with a state law exception to the hearsay rule for "former testimony",

> [i]t is clear that the *Roberts* Court sought to establish an approach to confrontation clause issues applicable to a range of cases beyond the particular facts before the Court at the time. The Court stated that it had been called upon "to consider once again the relationship between the confrontation clause and the hearsay rule with its *many* exceptions." It noted that the confrontation clause read literally would abrogate all hearsay exceptions, but that the Court had historically sought to reconcile the sixth amendment interest in face-to-face confrontation and right to cross-examination with the interests in law enforcement and precise evidentiary rules which underlie the hearsay exceptions. These competing interests are implicated no matter what hearsay exception is used to justify the admission of an out-of-court statement. Conse-

quently, the *Roberts* requirements apply to a broad range of cases.

*United States v. Massa*, 740 F.2d 629, 639 (8th Cir.1984) (citations omitted). The *Roberts* requirements have indeed been applied to a "broad range" of cases. *See, e.g., Haggins v. Warden*, 715 F.2d 1050, 1055 (6th Cir.1983) (excited utterance), *cert. denied*, —— U.S. ——, 104 S.Ct. 980, 79 L.Ed.2d 217 (1984); *Hutchins v. Wainwright*, 715 F.2d 512, 516 (11th Cir.1983) (statement of anonymous informant to police), *cert. denied*, —— U.S. ——, 104 S.Ct. 1427, 79 L.Ed.2d 751 (1984); *United States v. Washington*, 688 F.2d 953, 959 (5th Cir.1982) (business records); *Lenza v. Wyrick*, 665 F.2d 804, 810–11 (8th Cir.1981) ("state of mind" exception); *Williams v. Melton*, 733 F.2d 1492, 1496 (11th Cir.) ("res gestae" exception), *cert. denied*, —— U.S. ——, 105 S.Ct. 567, 83 L.Ed.2d 508 (1984); *United States v. H & M, Inc.*, 562 F.Supp. 651, 668 (M.D.Pa.1983) (statement against penal interest).

in a footnote, that "[a] demonstration of unavailability ... is not always required." 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7. As an example, the Court cited *Dutton*, where the "utility" of trial confrontation was "so remote that it did not require the prosecution to produce a seemingly available witness." *Id.*

■ Most jurisdictions have traditionally recognized an exception to the hearsay rule for the out-of-court statements of a party's coconspirators. Under the Federal Rules of Evidence an out-of-court statement that is "offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is classified as an "admission" and excluded from the definition of hearsay.[3] Fed.R.Evid. 801(d)(2)(E). The mere fact that the drafters of the Federal Rules opted to make coconspirator statements an exception to the definition of hearsay, rather than an exception to the rule excluding hearsay, Fed.R.Evid. 802, is of no consequence in applying the Confrontation Clause. *See United States v. Massa*, 740 F.2d 629, 639 (8th Cir.1984). *See also Ammar*, 714 F.2d at 256 ("We cannot ... abdicate our responsibility to preserve constitutional values to the rule writers, whether federal or state."). Nor does the drafters' reason for according coconspirator statements this special status as party admissions—"that each conspirator is an agent of the other and that the statements of one can therefore be attributable to all," *Ammar*, 714 F.2d at 255–56—justify any departure from the requirements of *Rob-*

erts. We have previously said that this rationale is a "legal fiction", *Ammar*, 714 F.2d at 255, and that the most plausible justification for the coconspirator exception in most cases is "the difficulty of proving conspiracy and related offenses," *Inadi*, 748 F.2d at 819. *See also* Mueller, *The Federal Coconspirator Exception: Action, Assertion, and Hearsay*, 12 Hofstra L.Rev. 323, 335 (1984). We are reminded of Justice Holmes' aphorism that "[t]he Constitution is not to be satisfied with a fiction." *Hyde v. United States*, 225 U.S. 347, 390, 32 S.Ct. 793, 811, 56 L.Ed. 1114 (1912) (dissent). Because coconspirator admissions lack the "special trustworthiness" that characterizes most admissible hearsay, we refused in *Ammar*, 714 F.2d at 255–56, to carve out an exception to the *Roberts* "reliability" requirement. And because the admissibility of such evidence is justified largely as a matter of necessity, we held in *Inadi*, 748 F.2d at 819, that the *Roberts* requirement that the government must demonstrate the unavailability of a declarant who is not produced for in-court confrontation is appropriate in the context of coconspirator admissions.[4] In holding the *Roberts* "unavailability" and "reliability" requirements fully applicable to the admissions of coconspirators who do not testify in court, we are joined by the other Courts of Appeals that have decided this question. *See United States v. Lisotto*, 722 F.2d 85, 88 (4th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1682, 80 L.Ed.2d 157 (1984); *United States v. Peacock*, 654 F.2d 339, 349 (5th Cir.1981), *cert. denied*, —— U.S.

The dissent's suggestion that *Roberts* only constitutionalizes pre-existing hearsay limitations cannot withstand analysis. Under the common law and Fed.R.Evid. 804 "unavailability" requirements evidence coming within the "former testimony" and "dying declaration" exceptions, among others, is inadmissible if the declarant is available to testify. Under *Roberts* the hearsay of an available declarant is admissible provided there is an opportunity for cross-examination. Thus, the *Roberts* requirements are in some respects more exacting than nonconstitutional hearsay limitations, and in some respects less exacting. They are patently different. Our holding does not, as the dissent claims, "eviscerate" the distinction between Rule 803 and Rule

804 hearsay exceptions; it is the dissent that fails to grasp the fundamental distinction between the traditional "unavailability" requirements and the rule announced in *Roberts*.

3. Federal Rule of Evidence 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

4. We certainly do not "reason", as the dissent charges, that *Inadi* follows "ineluctably" from *Ammar*. Rather, we reason that both *Inadi* and *Ammar* follow from *Roberts* and the theory of coconspirator admissions.

——, 104 S.Ct. 404, 78 L.Ed.2d 344 (1983); *United States v. Massa*, 740 F.2d 629, 639 (8th Cir.1984); *United States v. Ordonez*, 737 F.2d 793, 802 (9th Cir.1984); *United States v. Tille*, 729 F.2d 615, 620–21 (9th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 164, 83 L.Ed.2d 100 (1984). *See also United States v. Georgia Waste Systems*, 731 F.2d 1580, 1582 (11th Cir.1984).

■ In the instant case the government failed to produce the coconspirator-declarant James DiPasquale so that he could be cross-examined regarding his out-of-court statements that were admitted into evidence against Caputo. Thus, the government had the burden of showing that DiPasquale was unavailable to testify.[5] We find that the government did not meet its burden[6] in this case.

The government contends that it satisfied any burden it had to establish DiPasquale's unavailability when it apprised the district court, at some stage during the proceedings below,[7] that DiPasquale was under indictment in a related case and would have invoked his fifth amendment privilege if called to testify. The district court found that "[t]his good-faith representation is sufficient to show the necessity of introducing the declaration in the constitutional sense." We, however, believe that "[t]he right of confrontation may not be dispensed with so lightly." *Barber v. Page*, 390 U.S. 719, 725, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968).

In *Inadi*, 748 F.2d at 819–820, we held that, for purposes of Confrontation Clause analysis, unavailability to testify may be established by an assertion of the fifth amendment privilege and exemption by ruling of the court. Moreover, we suggested that "where the trial judge has a record—for example, in the form of an affidavit—that clearly establishes that the declarant would claim the privilege and that requiring him to appear in court would be a meaningless formality" an actual assertion of the privilege *in-court* might not be necessary. 748 F.2d at 820 n. 7 (as amended February 8, 1985). Here, however, the trial judge had nothing more than the representations of government counsel that DiPasquale would have taken the fifth. In *Inadi* we held that the government's assertions, on appeal, that a coconspirator-declarant would probably have taken the fifth did not establish unavailability. We believe that *Inadi* controls the result in this case. We would open a new chapter indeed in the history of our adversary system were we to permit the proponent of evidence to lay a constitutionally required foundation by such *ipse dixit*. Moreover, as we stated in *Inadi*, 748 F.2d at 820, "[u]nlike defendants, witnesses have no blanket right to stand mute." Thus, even if the trial judge could have been reasonably certain that DiPasquale—who had already pleaded guilty to the charges contained in this indictment—would have *asserted* his fifth amendment privilege, there was clearly not sufficient evidence in the record for the trial judge to determine that the assertion would have been proper and that an exemption from testifying would have been appropriate. "[I]f there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectua-

---

5. The government does not rely on the *Dutton* exception to the unavailability requirement, and we do not find it applicable here. We find no support in the cases or in our collective experience for the dissent's suggestion that, where coconspirator admissions are concerned, the utility of in-court confrontation is *per se* remote. That is not necessarily, as the dissent opines, the reason why a defendant's admissions can be used against him or her even where the defendant does not take the stand to explain or refute them. When a defendant exercises his or her fifth amendment right to remain silent, that too constitutes "unavailability".

6. There is no support in Confrontation Clause jurisprudence for the dissent's novel suggestion that a defendant should have to subpoena an adverse witness at the close of the government's case in order to cross-examine that witness.

7. The record available on appeal does not contain any such colloquy, but government counsel believes that it took place during the first trial, for which the court reporter's notes are missing.

tion." *Ohio v. Roberts*, 448 U.S. at 74, 100 S.Ct. at 2543 (emphasis in the original). Government counsel's representations in this case fall short of the Confrontation Clause's demands.[8]

### CONCLUSION

For the reasons set forth above, the judgment of conviction will be reversed and the case remanded for further proceedings consistent with this opinion.

SLOVITER, Circuit Judge, dissenting.

The majority's holding that the Confrontation Clause of the Sixth Amendment requires the government either to call a co-conspirator declarant or prove his or her unavailability before the coconspirator's statement is admissible represents an unwarranted extension of Supreme Court precedent. This holding, which reiterates that recently announced in *United States v. Inadi*, 748 F.2d 812 (3d Cir.1984) (also authored by Judge Higginbotham), will seriously hamper the government's use of such statements in the numerous conspiracy cases that it brings. While such a result would not justify disagreement with the majority's holding were it constitutionally compelled, I see no persuasive reason for the majority's conclusion that it is. Therefore, I respectfully dissent.

The majority relies on the Supreme Court's decision in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), for its conclusion that unavailability must be shown in the circumstances of this case. I believe that reading is overbroad. In the first place, *Roberts* dealt, not with a coconspirator's statement, but with a witness' prior testimony that had been given at a preliminary hearing. Thus the statement, unlike a coconspirator's statement, was clearly hearsay. In the second place, the Court held that the witness' unavailability at trial was established, so the lan-

guage upon which the majority relies is dictum. It is true, of course, that in the course of the decision the Court stated broadly:

> The Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay. First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. *In the usual case* (including cases where prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.
>
> The second aspect operates once a witness is shown to be unavailable. Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that "there is no material departure from the reason of the general rule."

*Id.* at 65, 100 S.Ct. at 2539 (emphasis added) (citations and footnote omitted). However, even taken literally, the language does not purport to impose an unavailability requirement in all cases, since the Court referred to the "usual case". There is no indication that the Court intended to apply its Confrontation Clause analysis to instances other than those in which unavailability was traditionally required at common law and which are codified in Fed.R.Evid. 804. *See, e.g., Mancusi v. Stubbs*, 408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293 (1972) (prior-trial testimony); *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970) (testimony at preliminary hearing); *Pointer v. Texas*, 380 U.S. 400, 407, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923 (1965) (dying declaration).

---

**8.** We have considered Caputo's other claims of error—that statements he made to a Drug Enforcement Administration agent were admitted into evidence in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), that evidence obtained in a search of his personal effects subsequent to his arrest should have been suppressed, that the district court erred in denying his pretrial motion for severance, and that there was insufficient evidence to support a conviction—and find them to be without merit.

The implication of the majority's reading of *Roberts* cannot be underestimated. It is important to keep in mind that the Federal Rules of Evidence divide the exceptions to the hearsay rule into two categories—statements that are admissible only if there is a showing that the declarant is unavailable as a witness (enumerated in Fed.R. Evid. 804(b)), and those which are admissible even though the declarant may be available (enumerated in the twenty-four exceptions in Fed.R.Evid. 803, captioned "Hearsay Exceptions; Availability of Declarant Immaterial."). The inevitable result of the majority's creation of a *per se* rule requiring unavailability to be shown as a precondition to the admission of out-of-court statements is to render unconstitutional the premise of Fed.R.Evid. 803 as applied in criminal cases. The Advisory Committee wrote:

> The present rule proceeds upon the theory that under appropriate circumstances a hearsay statement may possess circumstantial guarantees of trustworthiness sufficient to justify nonproduction of the declarant in person at the trial even though he may be available. The theory finds vast support in the many exceptions to the hearsay rule developed by the common law in which unavailability of the declarant is not a relevant factor.

Fed.R.Evid. 803 advisory committee note. In contrast, the Notes to Rule 804 refer to the evolution "[a]t common law [of] the unavailability requirement ... in connection with *particular* hearsay exceptions ...." Fed.R.Evid. 804 advisory committee note (emphasis added). The majority's holding eviscerates this distinction, and much of the common law upon which it is based.

The third reason why *Roberts* does not compel the result the majority reaches is that the Court itself stated:

> A demonstration of unavailability, however, is not always required. In *Dutton v. Evans*, 400 U.S. 74 [91 S.Ct. 210, 27 L.Ed.2d 213] (1970), for example, the Court found the utility of trial confrontation so remote that it did not require the

prosecution to produce a seemingly available witness.

*Roberts*, 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7. In *Dutton*, cited by the Court in *Roberts* for the proposition that unavailability is not required, the plurality concluded that the introduction of a coconspirator's statement that was admissible under applicable state law did not violate the Confrontation Clause (which also applies to the states) because there were sufficient indicia of reliability, even though the witness was not shown to be unavailable. Therefore, the approving reference to *Dutton* by the majority in *Roberts* casts substantial question on Judge Higginbotham's reliance on *Roberts* for precisely the opposite conclusion.

Even if the majority were correct in its conclusion that there must be a showing of unavailability before *hearsay* statements can be admitted into evidence, which was the only issue before the court in *Roberts*, the fundamental flaw in the majority's analysis is its treatment of a coconspirator's statement as hearsay. The majority fails to give adequate recognition to the fact that under the Federal Rules of Evidence, a coconspirator's statement is not hearsay. "[T]he Federal Rules of Evidence categorize coconspirator statements along with admissions as '[s]tatements which are not hearsay' under Rule 801(d)(2)". *United States v. Ammar*, 714 F.2d 238, 255 (3d Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). This view is in accord with the longstanding principle that statements made by a coconspirator, in the course of and in furtherance of the conspiracy, are, like acts committed by a coconspirator, substantively attributable to the other coconspirators as though the statements were their own. *See generally,* Mueller, *The Federal Coconspirator Exception: Action, Assertion, And Hearsay,* 12 Hofstra L.Rev. 323, 331–35 (1984); Fed. R.Evid. 801 advisory committee note.

I do not agree with the majority that the "mere" fact that the drafters of the Federal Rules chose to exclude coconspirators'

statements from the definition of hearsay is "of no consequence in applying the Confrontation Clause." The decision by the rulemakers was based on a well-supported understanding of the nature of admissions as evidence. As we pointed out in *Ammar*, "[T]he rationale for admitting evidence under the rules covering hearsay exceptions is different from that used to admit coconspirator statements." 714 F.2d at 255. We explained:

> Evidence falling within the hearsay exceptions is admissible because of its special trustworthiness. *See* McCormick, *supra*, § 262, at 628; 5 *Wigmore on Evidence* §§ 1420, 1422. Admissions, on the other hand, are not admitted because of confidence in their inherent reliability. They are instead admitted because a party will not be heard to object that s/he is unworthy of credence. As explained by the Advisory Committee, "Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule ...."

*Id.* (citation omitted).

The majority reasons that because in *Ammar* we held that coconspirators' statements are subject to a reliability inquiry under the Confrontation Clause, it follows that we must also subject such statements to an unavailability inquiry. That conclusion does not follow ineluctably. While reliability is a core value at issue either directly or in the abstract as to all evidence, the availability of a declarant is not always as important.

The distinction was implicitly recognized in *Roberts*. There the Court, in explaining its imposition of an unavailability requirement to certain forms of hearsay, referred to its "preference for face-to-face confrontation at trial," 448 U.S. at 63, 100 S.Ct. at 2537, but at the same time recognized that in some cases "the utility of trial confrontation [is] remote." *Id.* at 65 n. 7, 100 S.Ct. at 2538 n. 7. A party's admissions are among the statements falling within this latter group, since it is well established that a defendant's earlier statements are admissible, whether or not the defendant chooses to testify. *See generally* McCormick on Evidence § 145 (1972). Since coconspirator statements are treated as a category of party admissions, *see* Rule 801(d)(2), under the theory, albeit a "legal fiction that each conspirator is an agent of the other and that the statements of one can therefore be attributable to all." *Ammar*, 714 F.2d at 255–56, it is logical that they be treated similarly as admissions for this purpose as well.

The same rationale for dispensing with the availability requirement applies to both admissions and coconspirator statements. As to admissions, once the declarant has become a defendant, there may be a natural incentive to exculpate oneself and retract an earlier adverse admission. Since there was no such incentive when the statement was first made, the law admits it. There is a similarly strong temptation or incentive to retract a coconspirator statement since the declarant's cohort has now become a defendant and the declarant may also face prosecution. As with a defendant, the tendency to exculpate oneself or one's coconspirator at trial gives special utility to the admissibility of the earlier statements, even if the declarant may be available to testify. In both instances, the utility of trial confrontation is weaker than the utility of introduction of the earlier statement.

Moreover, a coconspirator's statement must meet the requirements established in Fed.R.Evid. 801(d)(2)(E) that the statement was made by a coconspirator, during the course of a conspiracy, and in furtherance thereof. These tend to supply even more indicia of reliability than necessary for a defendant's admission. The reliability requirements built into Fed.R.Evid. 801(d)(2)(E) and the Confrontation Clause will tend to ameliorate any possible untoward effect of admitting coconspirators'

statements. Furthermore, if the declarant is available, a defendant can subpoena the declarant after the conclusion of the government's case, to attempt to shed light on the statement. *Dutton v. Evans,* 400 U.S. 74, 96, 91 S.Ct. 210, 223, 27 L.Ed.2d 213 (1970) (Harlan, J., concurring in result). If the declarant is unavailable, the statement would be admissible in any event.

The Confrontation Clause was intended to prevent such gross abuses as trial by affidavit or deposition of principal witnesses. To shift the clause into a means to eliminate longstanding rules of evidence and to fix new ones in constitutional concrete "carries the seeds of great mischief," as Justice Harlan commented. *Id.* at 94–95, 91 S.Ct. at 222–23. The majority's conclusion increases the number of declarants who must mechanically appear at trial, and thereby complicates and protracts the proceedings.

Even if the majority were correct in its statement of the law, I would dissent from its judgment of reversal. It seems clear to me that introduction of DiPasquale's statements, even if violative of Caputo's Confrontation Clause rights, was harmless beyond a reasonable doubt. The statements of DiPasquale at issue here were repetitive of the direct testimony of several witnesses. Anthony Canale testified at length and in considerable detail that on several occasions he purchased methamphetamine from Caputo, sold it, and split the proceeds with Caputo. Most of these transactions also involved coconspirator DiPasquale. *See* Supp.App. at 24a, 33a–37a, 39a–42a, 45a–46a. Joseph Bocella, a witness cooperating with the prosecution, testified that he met with Canale and Caputo to buy methamphetamine. Supp.App. at 128a–129a. Thus, in the context of all the evidence, the introduction of the statements of DiPasquale would not warrant the reversal ordered by the majority. *Harrington v. California,* 395 U.S. 250, 253, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969); *United States v. Massa,* 740 F.2d 629, 641 (8th Cir.1984).